STATE v. RALPH BURGESS, WAYNE WATSON, NEIL DAVIS, TRAVIS TRIPLETT AND FRANK MARTIN.

(Filed 11 January, 1957.)

**1. Criminal Law § 8b—**

An aider or abettor is one who, being present, encourages, aids or assists the commission of a crime, or who is present for such purpose to the knowledge of the actual perpetrator, or who, whether present or not, instigates or procures another to commit the offense.

**2. Criminal Law § 52a(1)—**

Upon motion to nonsuit, the evidence must be taken in the light most favorable to the State, and it is entitled to the benefit of every reasonable inference to be drawn therefrom.

**3. Assault and Battery § 14—Evidence held sufficient for jury on question of defendant's guilt as aider and abettor.**

The State's evidence tended to show that the prosecuting witness was entrusted with a large sum of money by his employer for the purpose of buying a truck load of whiskey in another state, that the money was lost on the trip, and that upon the return of the witness he was taken by the other defendants to a secluded cabin and repeatedly beaten and hung by his wrists from the rafters while his hands were handcuffed behind him.

The evidence further tended to show that he was advised he was being beaten because of the lost money, that his employer visited the cabin while he was hanging to the rafters and made a statement to the effect that he thought the witness had taken the money, that the employer thereafter told the witness' wife that he did not know where the witness was, and later that night drove to her home and told her the witness was in jail charged with taking the money and giving it to her, that the employer thereafter again visited the cabin and conferred with some of the assailants, and that shortly after the employer left, the prosecuting witness was driven to his home in his own car. There was no evidence that any defendants other than the employer suffered financial loss by reason of the disappearance of the money. *Held:* The evidence supports the view that the employer was the instigator of the crime and procured his codefendants to commit the offense, and his motion to nonsuit was properly denied.

**4. Criminal Law § 81c(2)—**

Exceptions to the charge will not be sustained if it is without prejudicial error when construed contextually.

JOHNSON, J., not sitting.

APPEAL by defendants from *Mallard, J.,* July Special Term 1956 of ALEXANDER.

This is a criminal action tried at the July Special Term 1956 of the Superior Court of Alexander County. The defendants were indicted at the 27 September 1954 Term of the Superior Court of said county on three separate bills of indictment. One bill of indictment charges the defendants with kidnapping one Kenneth Jerome Hoglen; the second bill charges the defendants with maiming the said Kenneth Jerome Hoglen; and the third bill charges the defendants with a malicious and felonious assault upon the said Kenneth Jerome Hoglen with deadly weapons, with the intent to kill said Hoglen, inflicting serious injuries not resulting in death.

The State's evidence tends to show that two or three days prior to 13 August 1954, Kenneth Jerome Hoglen (hereinafter called Hoglen), was hired by the defendants Ralph Burgess and Wayne Watson to go to Washington, D. C., and get a load of whiskey. The defendant Burgess took the defendant Neil Davis to a schoolhouse between Taylorsville and Hiddenite where Davis got into the truck with Hoglen for the trip to Washington. The defendant Burgess gave Hoglen $13,000 in cash, Bud Watts gave him $1,000 and the other unnamed parties gave him $4,000, making a total of $18,000. The money was placed under the mattress in the sleeping compartment of the cab of the truck. When they arrived in Washington, Hoglen got out of the truck to telephone the man he was to contact. When he returned to the truck, according to Hoglen's testimony, the money was missing. He then put in a collect call to Burgess, designating Burgess as Fred

Dishman and representing himself as Ray Baker. He talked to Burgess and told him the money was gone and he could not find it in the truck where he put it; that Burgess then asked to speak to Davis. After Davis talked to Burgess, Davis told Hoglen that they were supposed to stay in Washington until Burgess arrived. Hoglen and Davis got a room at a hotel and spent the night. Davis did not return to North Carolina with Hoglen, but left Washington early on the morning of 12 August and returned to Taylorsville. Hoglen left Washington on the evening of 12 August and drove the truck back to Taylorsville where he was met by Davis, Watson and Triplett.

Shortly after 2:00 o'clock on the morning of 13 August, Hoglen and the defendants Watson, Davis and Triplett drove to a cabin on the river near Oxford Lake. Hoglen was told by Davis that Burgess was at the cabin. Burgess was not there when they arrived. They sat around a table talking. All at once Watson jumped up with a pistol in his hand and began cursing, stating that he was going to kill Hoglen. The defendant Davis put handcuffs on Hoglen and drew a pistol out of his pocket, also stating that he was going to kill Hoglen. Davis took everything out of Hoglen's pockets, and Davis, Watson and Triplett ran a rope through the chain that held the handcuffs together and threw the rope over a rafter. These defendants pulled Hoglen's arms up as high as they could get them and tied the rope to the rafter. Later on, they put a Coca-Cola crate under Hoglen's feet. With the rope, they pulled the weight off his feet and hung him up after they had kicked and beaten him until he stepped up on the Coca-Cola crate. Watson, Davis and Triplett all beat the witness with pistols. They hit him in the mouth, cut his lip, knocked out one tooth and cracked two more. Watson did most of the beating. Later, the Coca-Cola crate was knocked from under him and Hoglen was left suspended in the air for five or six hours or more. When he was taken down, he was allowed to sit on a couch but he was still handcuffed. He was beaten over the side of the head with something wrapped in a white rag. Triplett threatened to cut off Hoglen's toe nails. He had an open knife in his hand when he made the threat. He jerked Hoglen's shoes and socks off but did not actually cut off his toe nails. After they had allowed him to rest for a while, Davis, Triplett and Watson strung him up to the rafter again, in the same position as before. His wrists were cut and bleeding and blood was running down his arms. At that time Burgess and Martin came in. Burgess did not stay very long. When he left, he said he was going home. Hoglen said to Burgess, "Puff, you know I didn't take the money that you sent with me up there, and he said he was afraid I did." Watson asked Hoglen if he had ever thought of praying. Hoglen said "Yes." Martin said, "Now is a good time to start, for these people are going to kill you." At that time,

Watson, Triplett, Davis and Martin were in the room. They told Hoglen the reason they were treating him the way they were was because the $18,000 was missing and they thought he had taken it. When Burgess left, Hoglen was still suspended to the rafter but there was a Coca-Cola crate under him so that his weight was not on his arms. Hoglen became unconscious; after he regained consciousness, Davis kicked the Coca-Cola crate from under him and he was once more suspended by his arms. While he was hanging there, the handcuffs came loose and dropped to the floor. That released Hoglen and he started to leave the cabin but was too weak to open the door. Watson had a pistol in his hand and Davis and Triplett put the handcuffs on Hoglen again and again strung him up to the rafter in the same position as on the two previous occasions. All the defendants, except Burgess, were present at the time. Watson sent Davis out to cut some sticks to use in beating Hoglen. Davis came in with the sticks and started to beat Hoglen. Hoglen does not know how long he was suspended the third time.

Hoglen's wife, becoming apprehensive as to the whereabouts of her husband, went to the home of the defendant Burgess on the evening of 13 August 1954. Davis was in the yard of the Burgess home when she arrived but was not present when Mrs. Hoglen had the conversation with Burgess about her husband. She testified, "I asked Ralph Burgess if he had seen Kenneth and Ralph Burgess told me that he had not seen him, but he expected to see him that night and said he would tell him that I was looking for him." She further testified that on Saturday, 14 August, about 2:00 or 2:30 a.m., Ralph Burgess came to her home at Fort Mill, South Carolina, and told her that her husband was in Baltimore in jail and was accused of taking $18,000 and giving it to her in Greensboro, North Carolina. That she told him she had not met her husband in Greensboro and had not received any money from him.

The defendant Burgess returned to the cabin near Oxford Lake Saturday afternoon, 14 August, and Hoglen was taken down. This was the third time he had been suspended to the rafter. All the defendants were present when he was taken down, including Burgess. Burgess didn't have anything to say to Hoglen at that time but he called the rest of the defendants out of the cabin, except Travis Triplett. Martin, Watson, Davis and Burgess went to the edge of the woods nearby and were talking, but Hoglen could not hear what they were saying. When they returned to the cabin, Burgess said there was a good swimming hole down there and why didn't the boys go down there and take a swim, so they said they thought they would. After the boys came back, Ralph Burgess and Travis Triplett left. It was some time after they left that Bud Watts arrived at the cabin in Hoglen's car and took him to his home in Fort Mill. Bud Watts drove the car into

the yard of Hoglen's home and left him and got in another car that had followed them from Oxford Lake, and left. According to Hoglen's testimony, he left Oxford Lake about 4:00 o'clock in the afternoon of 14 August.

Hoglen was taken to the hospital on the night he returned to his home and remained in the hospital until the following Wednesday. Several articles of clothing worn by Hoglen at the time of his experience in the cabin were introduced in evidence. The clothing had on them spots of grease and blood. After being released from the hospital, he was under the care of doctors for several weeks.

Hoglen testified that he did not know what became of the money Burgess gave him.

In addition to having one tooth knocked out and two more cracked, according to the testimony of Dr. M. A. Culp, the body of Hoglen was severely bruised, cut and lacerated; one eye was swollen closed; he had a deep cut on the lower lip, cuts on his face and neck, bruises and lacerations from his shoulders to his ankles; his hands were swollen and blue and he was unable to flex his fingers and there was a certain numbed area on his right arm.

The defendant Burgess introduced no evidence. None of the defendants testified in their own behalf. However, the other defendants introduced witnesses who testified that the general reputation of Hoglen was bad.

At the conclusion of all the evidence, a motion for judgment as of nonsuit was sustained as to the charge of maiming. The jury returned a verdict of not guilty on the charge of kidnapping. On the charge of assault with a deadly weapon, with intent to kill, the jury convicted each of the defendants of the lesser offense of "guilty of an assault with a deadly weapon." From the judgments pronounced on the verdicts, each of the defendants appeals to this Court, assigning error.

*Attorney-General Patton and Assistant Attorney-General Love for the State.*

*Justus C. Rudisill, Jr., McLaughlin & Battley, and Allen, Henderson & Williams for defendant Ralph Burgess.*

*Frank C. Patton, Wade H. Lefler, Ray Jennings, and W. H. Mc-Elwee for the other defendants.*

DENNY, J. The defendants Watson, Davis, Martin and Triplett are insisting upon a new trial, while the defendant Burgess strenuously argues and contends that his motion for judgment as of nonsuit should be allowed and assigns the denial thereof as error.

The defendant Burgess takes the position that there is no evidence that Hoglen was actually assaulted by him or that he participated in

any manner in the assaults upon Hoglen or that he encouraged, aided or abetted the perpetrators of the assaults. He further contends that while there is evidence of his presence at the cabin on two occasions while Hoglen was there, there is no evidence that Hoglen was assaulted by anyone in his presence. This defendant is relying on *S. v. Ham,* 238 N.C. 94, 76 S.E. 2d 346; *S. v. Birchfield,* 235 N.C. 410, 70 S.E. 2d 5; *S. v. Holland,* 234 N.C. 354, 67 S.E. 2d 272; *S. v. Johnson,* 220 N.C. 773, 18 S.E. 2d 358, and *S. v. Hart,* 186 N.C. 582, 120 S.E. 345, to sustain his position.

In the case of *S. v. Ham, supra,* this Court, in substance, held that in order to render one who does not actually participate in the commission of the crime guilty of the offense committed, there must be some evidence tending to show that he, by word or deed, gave active encouragement to the perpetrators of the crime, or by his conduct made it known to such perpetrators that he was standing by to render assistance when and if it should become necessary.

An aider and abettor is defined in our decisions as one who advises, counsels, procures or encourages another to commit a crime. *S. v. Hart, supra; S. v. Holland, supra; S. v. Williams,* 225 N.C. 182, 33 S.E. 2d 880; *S. v. Ham, supra.*

In the case of *S. v. Birchfield, supra, Ervin, J.,* speaking for the Court, said: "The mere presence of a person at the scene of a crime at the time of its commission, does not make him a principal in the second degree; and this is so even though he makes no effort to prevent the crime, or even though he may silently approve of the crime, or even though he may secretly intend to assist the perpetrator in the commission of the crime in case his aid becomes necessary to its consummation."

In *S. v. Holland, supra,* it is said: "It is settled law that all who are present (either actually or constructively) at the place of a crime, and are either aiding, abetting, assisting, or advising in its commission, or are present for such purpose, to the knowledge of the actual perpetrator, are principals and are equally guilty."

In the case of *S. v. Johnson, supra,* the Court said: "A person aids when, being present at the time and place, he does some act to render aid to the actual perpetration of the crime, though he takes no direct share in its commission, and an abettor is one who gives aid and comfort, or who either commands, advises, instigates or encourages another to commit a crime."

*Stacy, C. J.,* in speaking for the Court in the case of *S. v. Hart, supra,* said: "An aider and abettor is one who advises, counsels, procures, or encourages another to commit a crime, whether personally present or not, at the time and place of the commission of the offense."

In 22 C.J.S., Criminal Law, section 79, page 143, it is said: "A person is a party to an offense if he either actually commits the offense or does

some act which forms a part thereof, or if he assists in the actual commission of the offense or of any act which forms part thereof, or directly or indirectly counsels or procures any person to commit the offense or to do any act forming a part thereof. To constitute one a party to an offense it has been held to be essential that he be concerned in its commission in some affirmative manner, as by actual commission of the crime or by aiding and abetting in its commission and it has been regarded as a general proposition that no one can be properly convicted of a crime to the commission of which he has never expressly or impliedly given his assent."

In passing upon a motion for nonsuit, the evidence must be considered in the light most favorable to the State, and it is entitled to the benefit of every reasonable inference to be drawn therefrom. *S. v. McKinnon,* 223 N.C. 160, 25 S.E. 2d 606; *S. v. Gentry,* 228 N.C. 643, 46 S.E. 2d 863; *S. v. Ritter,* 239 N.C. 89, 79 S.E. 2d 164.

There can be no conjecture about the evidence tending to show these facts: For some time prior to the occasion in question, Hoglen was employed by the defendants Burgess and Watson to drive a truck for them; that the defendant Davis and Hoglen were sent to Washington by Burgess and Watson to buy a truck load of liquor; that Burgess gave Hoglen $13,000 in cash for this purpose and Bud Watts gave him $1,000, while unnamed parties gave him $4,000; that all together Davis and Hoglen were entrusted with $18,000, and their truck. The money was lost. When Hoglen got back to Taylorsville he was met by Davis, an employee of Burgess, Watson, one of the employers of Hoglen, and one Triplett. Davis informed Hoglen that Burgess was at the cabin, which turned out to be near Oxford Lake and the place where he was assaulted. Hoglen was brutally assaulted as set out in the statement of facts. Burgess and Martin arrived at the cabin after Hoglen had been assaulted and while he was still handcuffed and hanging to a rafter in the cabin. Hoglen denied having taken the money; Burgess replied "he was afraid he did." Burgess left while Hoglen was still hanging to the rafter in the cabin. No motive or reason whatsoever was given for torturing and beating Hoglen, except that the money was missing and Davis, Martin, Watson and Triplett said they thought Hoglen had taken it and that was why he was being treated as he was. On Friday night, 13 August 1954, Burgess told Hoglen's wife that he did not know where her husband was, when, as a matter of fact, he had been in the cabin that day and talked to Hoglen and knew what was being done to him. Later that night he drove to Fort Mill, South Carolina, to Hoglen's home, and told Mrs. Hoglen that her husband was in jail in Baltimore, charged with taking $18,000 and giving it to her in Greensboro. No information that might lead to a recovery of the money was obtained from the wife of Hoglen or from the beaten and tortured Hoglen.

Finally, after Hoglen had been detained by force at the cabin from 2:00 or 3:00 o'clock on the morning of 13 August until the mid-afternoon of 14 August, Burgess showed up for the second time at the cabin and called all his co-defendants, except Triplett, out for a conference. After the conference, he suggested that they go swimming. Burgess and Triplett left the cabin. Shortly thereafter Bud Watts arrived at the cabin in Hoglen's car, and the defendant Watson told the defendant Martin to help Hoglen dress. The handcuffs were removed and Hoglen was aided in dressing and left with Watts in Hoglen's car for his home in Fort Mill, South Carolina, about 4:00 p.m.

We think the reasonable inference to be drawn from Burgess' conduct, his suppression of the truth as to the whereabouts of Hoglen when inquiry was made of him by Hoglen's wife; his appearance at the home of Hoglen in Fort Mill at 2:00 or 2:30 a.m., Saturday, 14 August; his statement to the effect that her husband was in jail in Baltimore for having taken $18,000 and delivering it to her in Greensboro; his later appearance that day at the cabin which apparently resulted in the release of Hoglen, support the view that Burgess was the instigator of the crime and procured his co-defendants to commit the crime.

There is no evidence that any of the other defendants suffered a financial loss by reason of the disappearance of the money. The defendant Burgess, and he alone, was to benefit from any confession wrung from Hoglen that might lead to the recovery of the money, in so far as the other defendants were concerned. "A man's motive may be gathered from his acts, and so his conduct may be gathered from the motive by which he was known to be influenced." *S. v. Wilcox,* 132 N.C. 1120, 44 S.E. 625; *S. v. Adams,* 136 N.C. 617, 48 S.E. 589; *S. v. Coffey,* 210 N.C. 561, 187 S.E. 754; *S. v. Church,* 231 N.C. 39, 55 S.E. 2d 792.

The attorneys for the defendant Burgess were unusually alert in safeguarding his rights with respect to the admission of evidence. And the contentions of all the defendants were presented on the appeal in this Court with commendable zeal. Even so, the State made out a case for the jury.

The record contains 29 assignments of error based on 132 exceptions. Assignments of error Nos. 3 through 22 are based on exceptions to the charge. A careful examination of the charge, however, when considered contextually, as it should be, leads us to the conclusion that it is in substantial accord with our decisions on the questions presented by the exceptions and is free from prejudicial error. *S. v. Davenport,* 227 N.C. 475, 42 S.E. 2d 686; *S. v. Smith,* 221 N.C. 400, 20 S.E. 2d 360; *S. v. Manning,* 221 N.C. 70, 18 S.E. 2d 281. The other assignments of error are formal.

In the trial below we find
No error.

JOHNSON, J., not sitting.