STATE OF NORTH CAROLINA v. MARY BENTON BENTON

No. 17

(Filed 12 June 1970)

**1. Witnesses § 1— competency of witness — unsoundness of mind**

Unsoundness of mind does not *per se* render a witness incompetent.

**2. Witnesses § 1— mental capacity of witness — discretionary ruling of court**

In determining the competency of a witness the trial judge is not bound by expert testimony and, notwithstanding the opinion evidence of a psychiatrist that the State's material witness could not give reliable testimony, the judge did not abuse his discretion in ruling the witness mentally competent to testify where (1) the judge observed and questioned the witness closely on *voir dire*, (2) the witness' subsequent testimony on the trial was clear and consistent on all material matters and fully corroborated by his family and law-enforcement officers, and (3) the psychiatrist had not seen the witness for more than a year and a half prior to trial.

**3. Criminal Law § 163— assignment of error to charge — requisite**

An assignment of error must set out that portion of the charge which defendant contends is an erroneous statement of the law.

**4. Criminal Law § 63— mental capacity of murderer — form of question to psychiatrist**

The trial court properly refused to permit a psychiatrist to state if he had an opinion whether the murderer knew right from wrong on the day of the homicide.

**5. Criminal Law § 5— insanity of accused — exemption from criminal responsibility**

Insanity will exempt an accused from criminal responsibility only if, at the time he commits the act which would otherwise be illegal, he was incapable of knowing the nature and quality of his act or of distinguishing between right and wrong with relation thereto.

**6. Criminal Law § 163— assignment of error on the failure to charge**

An assignment of error based on a failure to charge should set out the defendant's contention as to what the court should have charged.

**7. Criminal Law §§ 10, 168— accessory before fact to murder — instructions on guilt of principal — harmless error**

In a prosecution of defendant as an accessory before the fact to the murder of her husband, in which prosecution the defendant was found guilty and given a sentence of life imprisonment, defendant was not prejudiced by trial court's failure to instruct the jury that if the murderer, by reason of insanity, was not guilty of the murder then the defendant could not be guilty as an accessory before the fact, since all the evidence tended to show that if the defendant was not an accessory then she was the principal felon and guilty of murder in the first degree.

**8. Homicide § 2— parties to a murder**

Parties involved in the commission of a murder are either principals or accessories.

**9. Criminal Law § 9— principals in the first and second degree**

A principal in the first degree is the person who actually perpetrates the deed either by his own hand or through an innocent agent; any other who is actually or constructively present at the place of the crime either aiding, abetting, assisting, or advising in its commission, or is present for that purpose, is a principal in the second degree.

**10. Criminal Law § 9— distinction between principals**

The distinction between principals in the first and second degrees is a distinction without a difference; both are principals and equally guilty.

**11. Criminal Law § 10— accessory before the fact**

An accessory before the fact is one who was absent from the scene when the crime was committed but who procured, counseled, commanded or encouraged the principal to commit it.

**12. Criminal Law § 10— distinction between principal and accessory**

Ordinarily, the only distinction between a principal and an accessory before the fact is that the latter was not present when the crime was actually committed.

**13. Criminal Law § 9— commission of crimes through innocent agent — status of absent party**

If a person causes a crime to be committed through the instrumentality of an innocent agent, he is the principal in the crime and is punishable accordingly, although he was not present at the time and place of the offense.

**14. Homicide § 2; Criminal Law § 10— accessory or principal — inciting mental defective to kill another**

Where one incites or employs a mental defective to kill another, the question whether the employer is guilty as a principal depends upon whether the defective was criminally responsible for his act under the McNaughten rule.

**15. Homicide § 31— first degree murder — punishment**

The punishment specified in G.S. 14-17 for first-degree murder is either death or imprisonment for life.

**16. Criminal Law § 168— review of the charge**

A charge must be construed contextually as a whole.

**17. Homicide §§ 2, 23; Criminal Law § 10— accessory to murder — instructions — causal relationship between principal and accessory**

In a prosecution of defendant as an accessory before the fact to the murder of her husband, the charge of the trial court, when construed as a whole, clearly instructed the jury that before they could convict the defendant they must find that her requests and demands that the principal murder her husband caused the principal to commit the crime.

**18. Criminal Law § 161— assignments and exceptions**

Asserted error must be based on an appropriate exception and must be properly assigned. Rules of Practice in the Supreme Court Nos. 19 and 21.

**19. Criminal Law § 161— assignment of error — question presented — form and sufficiency**

An assignment of error must show specifically what question is intended to be presented for consideration without the necessity of going beyond the assignment of error itself.

**20. Criminal Law § 161— assignment of error — mere reference to record page**

A mere reference in the assignment of error to the record page where the asserted error may be discovered is not sufficient.

**21. Criminal Law § 146— Supreme Court — mandatory rules**

The rules of practice in the Supreme Court are mandatory and will be enforced.

**22. Homicide § 23; Criminal Law § 10— accessory to second-degree murder — instructions**

In a prosecution of defendant as an accessory before the fact to the murder of her husband, defendant was not prejudiced by an instruction which would permit the jury to return a verdict of guilty as an accessory to murder in the second degree.

**23. Homicide § 2; Criminal Law § 10— accessory to murder**

There can be an accessory before the fact to murder in the second degree.

**24. Statutes § 11— repeal by implication**

Courts will not presume that the legislature intended a repeal by implication.

**25. Statutes § 5— presumption that legislature acted with knowledge of existing law**

It is always presumed that the legislature acted with care and deliberation and with full knowledge of prior and existing law.

**26. Homicide § 31; Criminal Law § 138— accessory to murder — severity of punishment — lesser sentence for murderer**

Defendant was convicted as an accessory before the fact to the murder of her husband and was sentenced to life imprisonment; the actual murderer was sentenced to 20-30 years' imprisonment upon acceptance of his guilty plea to second-degree murder. *Held:* Defendant's objection that her sentence exceeded that of the murderer is without merit, since both sentences were authorized by statute.

**27. Homicide § 31— accessory to murder — punishment**

The punishment for an accessory before the fact to murder in any degree is imprisonment for life.

**28. Homicide § 31;   Constitutional Law §§ 20, 36—   accessory to murder — life sentence — cruel and unusual punishment — equal protection of laws**

Imposition of a sentence of life imprisonment upon defendant's conviction of accessory before the fact to the murder of her husband — the actual murderer having received a sentence of 20-30 years' imprisonment upon acceptance of his guilty plea to second-degree murder — was not cruel and unusual punishment nor did it deny defendant the equal protection of the laws in violation of the Fourteenth Amendment.

**29. Constitutional Law § 20—   equal protection of the laws — quantum of punishment**

Equal protection of the laws is not denied by a statute prescribing the punishment to be inflicted on a person convicted of a crime unless it prescribes different punishment for the same acts committed under the same circumstances by persons in like situations.

**30. Attorney and Client § 5—   obligations of court-appointed counsel — compliance with rules of Supreme Court**

The rules of the Supreme Court are applicable to indigent defendants and their court-appointed counsel as well as to all others, and the obligations of court-appointed counsel to his client and to the court are no less than those of privately retained counsel.

**31. Criminal Law § 146;   Attorney and Client § 5—   infractions of Supreme Court rules — warning to court-appointed counsel**

The Supreme Court cannot be expected to continue the practice of indulging infractions of its rules by court-appointed counsel in criminal cases.

APPEAL by defendant under G.S. 7A-27(a) from *Martin, J. (Harry C.)* October 1969 Criminal Session of BURKE.

This is defendant's second appeal from a judgment of life imprisonment imposed after her conviction as an accessory before the fact to the murder of her husband, Marshall Adam Benton (Benton). G.S. 14-5, G.S. 14-6. When the case was first before us at the Spring Term 1969, we arrested the judgment because of a fatal defect in the bill of indictment. *State v. Benton*, 275 N.C. 378, 167 S.E. 2d 775.

At the September Session 1969, the grand jury returned a new bill. In substance, it charged that on 27 November 1967, defendant feloniously counseled, incited, and procured Raymond Epley to murder Benton; that later, on the same day, and out of defendant's presence, Raymond Epley did feloniously kill and murder Marshall Adam Benton with premeditation, deliberation, and malice aforethought. The case was retried at the October 1969 Session.

The State relied mainly upon the testimony of Raymond Epley. When Epley was sworn, defendant challenged his competency as a

witness on the ground that he lacked sufficient mental capacity. On *voir dire* the judge elicited the following information from Epley: He went to the eighth grade in school. He could read and write "fairly well" but never passed his courses. He was "moved up from grade to grade because he was bigger than the other children in his class." After he quit school he worked two or three years for Breeden Poultry. He was then employed by Shelby Iron Works for two years before going to work at Doblin Carolina Mill (Doblin). In 1960 he got a North Carolina driver's license. He attended Sunday School and church at the Mount Olive Baptist Church.

When asked if he knew where he was at the moment, Epley told the judge that he was in the courtroom in Morganton, Burke County, North Carolina. In response to the direct question, he said that when he placed his left hand on the Bible and raised his right hand it meant to him that he was "to tell the truth about something that has happened and all the things," and that if he told a lie he believed he would be punished in some way after death.

On cross-examination he said that he was quite upset when his father died in June 1967; that thereafter his deceased father talked to him until the following March; that when he sat in places where his father used to sit his father would talk to him; that on 27 November 1967 he was taking various kinds of pills which affected his memory to the extent that he could "remember some of what happened"; that he knew what happened on 27 November 1967 and some of the things that happened several days before. He said that he remembered talking to Dr. Robert S. Darrow in jail but that it was so long ago he had forgotten many things he said to him.

Dr. Darrow, a psychiatrist engaged in private practice, testified for defendant on *voir dire* and thereafter. His testimony tended to show: During December 1967 and early in 1968 he had examined Epley in jail on four occasions. He found him to be depressed and upset both mentally and physically, concerned and preoccupied with his father's death, and subject to auditory hallucinations. Dr. Darrow gave Epley no tests, but he thought Epley's I. Q. was 60-70. It was his opinion that Epley had a mental illness, a "combination of mental deficiency and psychotic reaction," which rendered it "impossible for him to be believed and impossible for him to give reliable evidence." Epley was still mentally ill when Dr. Darrow stopped seeing him on 13 March 1968, but his illness decreased as time went on. However, it had not completely disappeared and would not for a time to come.

During the *voir-dire* examination, Judge Martin noted that Epley

sat upright in the witness chair, spoke clearly, and did not ask that questions be repeated.

At the conclusion of the *voir dire,* Judge Martin found facts which are supported by the foregoing evidence. Upon his findings he concluded that Epley understood the nature and obligations of an oath and was capable of giving a correct account of crucial events. He held him to be a competent witness.

Epley's testimony tended to show: He was 25 years old. He first met defendant Mary Benton in August 1967. Both worked the 11:00 p.m.-7:00 a.m. shift in the winding room at Doblin. Both were married. Epley was separated from his wife, who lived in Shelby. Defendant's husband, Benton, worked from 7:00 a.m. to 3:00 p.m. for a furniture company in Valdese. Defendant and Epley became friends after they began to "talk at their work." Their friendship quickly developed into intimacy, and Epley became familiar with the house where defendant and Benton lived. She told Epley that Benton treated her badly and beat her a lot. On one occasion he told defendant that if Benton ever beat her again he would kill him, and he meant it.

Benton and Epley made plans to go deer hunting on the Friday after Thanksgiving 1967 (November 25th). On Thanksgiving Day defendant told Epley that she wanted him to kill Benton while they were deer hunting, and make it look like an accident. He told her that he did not know whether he could kill Benton or not. (So far as the evidence discloses no untoward event occurred on the deer hunt.)

After he got off work on Monday morning, 27 November 1967, Epley went to his mother's home. He was worried, could not sleep, and was "taking all those pills." At about 9:00 a.m. defendant came to see him. She was crying. She told him that Benton had again "been beating her and treating her like a dog"; that if they did not kill him that night he was going to kill Epley and that she was pregnant by Epley. She also told Epley "that she had everything fixed up; that the back bedroom light would be on, the curtains pulled back, and Benton would be in bed."

After his conversation with defendant, Epley went to bed and slept until about 10:00 p.m., when he was awakened by a telephone call from defendant. She advised him that everything was ready. He told her he was scared but that he would do it.

Epley borrowed his brother's rifle on the pretense of going deer hunting and left home about 10:25 p.m. He drove past the Benton

home on the Flat Gap Road and parked his car 100-200 yards from the house. After loading the rifle he walked back "and shot through the window at a hunch in the bed that looked like a body." He said he did not know whether a bullet from his gun killed Benton "but he meant to be shooting at Marshall (Benton)." Immediately thereafter someone started shooting at him, and he ran back to his car. As he drove away he "run up" on a parked car from which five or six shots were fired at him. He drove to Shelby to the home of his father-in-law, where his wife lived. Then, after hiding the rifle in his brother-in-law's bed he went to the hospital, where his baby was a patient. There he met his wife and returned with her to her home. About 5:30 the next morning he received a telephone call from Burke County Officers McGalliard and Fowler. In consequence he met them on highway No. 18, where they arrested him for the murder of Benton. In Morganton, Epley told the officers and Sheriff Wise "the best of the truth that he could tell."

Epley was indicted and put on trial for the first-degree murder of Benton on 14 March 1968. He was represented by Lawyers Riddle and McMurray. At that time, after being asked some questions, he entered a plea of guilty of second-degree murder. He received a sentence of 20-30 years, which he was serving at the time of defendant's trial.

On direct examination, Epley testified that he did not know for sure whether a bullet from his gun killed Benton but "that he meant to kill Marshall Benton because Mary Benton had asked him to and told him that Marshall was going to kill him if he didn't do it, and she kept pushing him and he went and done it."

On cross-examination, Epley said that he did not know whose idea it was to kill Benton; that on the night of 27 November 1967 he was taking pills and not thinking straight; that he could not remember everything that happened or "what all" he did tell Dr. Darrow, but he tried to tell him the truth. He also said, *inter alia,* that in five years he would be eligible for parole if he makes a good prisoner and, for that reason, he had written defendant that with luck he would be out of jail in five years; that he really wanted to marry her and that he would get her even if he had to kill his wife.

Other evidence for the State tended to show: About 9:15 p.m. on 27 November 1967, Manuel Brittain, a deputy sheriff of Burke County, was stationed outside the Benton home observing it. (Apparently the Burke County's Sheriff's Department had learned of the plot to kill Benton, although the record is silent as to this.) The Benton house was well lighted; the bedroom curtains were drawn,

and Brittain could see through the window. At approximately 10:10 p.m. defendant left her home and drove toward highway No. 350 in the white Corvair automobile. Brittain radioed the sheriff's office that she had left. Special Deputy Harold Cook, who had been parked at the Abee Grove Church about one mile from the Benton home, was waiting when the white Corvair entered highway No. 350. He followed the automobile into Valdese, where defendant stopped at a telephone booth and placed a call. It was then between 10:15 and 10:30 p.m. After radioing the sheriff's office Cook followed defendant into Morganton and to Doblin Mill, which she entered at about 11:00 p.m.

At approximately 10:55 p.m. a 1960 Chevrolet passed by Deputy Sheriff Brittain's post of observation and stopped about 250 feet south of the Benton house. He saw a man get out of a car and walk back toward the house. Brittain was about 40-50 feet from him when he saw the flash of a gun. He shouted to the gunman to halt, but he continued to fire. Someone screamed, and Brittain "emptied his service revolver at the subject. He saw the subject make three flashes toward the bedroom from a high-powered rifle; then the subject fired in his direction and ran." Brittain entered the house and found Benton lying on his back with a large wound in his chest. He was unconscious and had no pulse beat. Brittain called the Sheriff's department to send an ambulance and to look for "a white 1960 Chevrolet headed on highway No. 350 with one subject in it."

At about 10:30 or 10:35 p.m., Deputy Sheriff Bob Fowler, who was at the Abee Chapel Church, met Epley driving a white 1960 Chevrolet toward highway No. 350. After attempting unsuccessfully to stop him, he fired at the car and followed it until it evaded him on highway No. 350.

Sheriff Wade McGalliard went to the Benton home and found Benton lying on a bed in the center bedroom fully clothed. He was dead. The double window of the bedroom was broken, and there were two holes, about the size of a pencil and six inches apart, in the lower right-hand corner. Between two trees near a bush he found empty 30.06-cartridges.

Sometime before 6:00 a.m. on November 28th Epley was arrested in Cleveland County on highway No. 18. He was operating the white 1960 Chevrolet automobile, and his wife, Molly, was with him. At her invitation the officers went to her father's home, where they obtained a 30.06 rifle.

Epley told McGalliard that he had killed Benton; that he and defendant had planned it, and he would not take all the blame. He

said he drove to the Benton house "to do it" after defendant had telephoned him "that everything was ready; that a light would be on in the room and the curtains pulled back; that after he received the call he left the house with the rifle and shot Benton through the window."

Epley's brother Jack testified that on Thanksgiving Day defendant had asked him to shoot Benton if he went hunting with him and Epley on Friday; that he declined and decided then and there not to go on the hunt; that he said nothing to Epley about this conversation; that on November 27th defendant telephoned Epley and he got him up to take the call. Jack did not hear any part of the conversation.

Epley's mother, Mrs. Elsie Epley, testified for the State. Her evidence tended to show: About 10:25 p.m. on 27 November 1967, Epley received a telephone call, and she listened to his side of the conversation. Two or three times he asked his caller if everything was ready, and a few minutes thereafter she heard him say, "You say everything is ready." His final words were, "Bye, hon, I will see you directly." After that conversation Epley got his coat and left. He seemed sleepy and acted as if he were under the influence of some kind of drug. He was taking pills. Thereafter she saw Epley in jail and asked him "if he had done it." He said he didn't know whether he had or not, that he and defendant "had made it up."

Defendant's only witness was Dr. Darrow. His testimony before the jury was substantially the same as on *voir dire*. It tended to show that on account of his mental illness and low intelligence Epley could not remember on his own the events of 27 November 1967; that he did not have the ability to distinguish between the real and the unreal, and "he could not live in reality." On cross-examination he said that on one occasion Epley had told him "that he believed that in having killed a man that he had done no wrong since his girlfriend wanted him to do so. He did it because he would do anything she wanted him to do because he loved her."

"For the purpose of corroboration or impeachment" defendant introduced scattered excerpts from the "testimony at former trials." These excerpts, constituting four pages of the mimeographed case on appeal, are not regarded as material, and are not summarized here.

At the conclusion of the evidence defendant's motion for nonsuit was overruled. The jury's verdict was guilty of the offense of accessory before the fact of murder. From the judgment of life imprisonment, defendant appealed.

*Robert Morgan, Attorney General; Ralph Moody, Deputy Attorney General; and D. M. Jacobs, Staff Attorney, for the State..*

*Byrd, Byrd & Ervin for defendant appellant.*

SHARP, J.

Appellant enumerates 26 assignments of error. Those brought forward, which we deem entitled to consideration, will be discussed topically.

[1, 2]    Assignments Nos. 1, 2, and 3 raise the question whether the trial judge abused his discretion in holding that Epley had sufficient mental capacity to be a competent witness. The North Carolina rule is well stated in 97 C. J. S. *Witnesses* § 57 (b) (1957) : "Unsoundness of mind does not per se render a witness incompetent, the general rule being that a lunatic or weak-minded person is admissible as a witness if he has sufficient understanding to apprehend the obligation of an oath and is capable of giving a correct account of the matters which he has seen or heard with respect to the questions at issue. The decision as to the competency of such a person to testify rests largely within the discretion of the trial court." *Accord, Lanier v. Bryan,* 184 N.C. 235, 114 S.E. 6, 26 A. L. R. 1488; *Carpenter, Solicitor v. Boyles,* 213 N.C. 432, 196 S.E. 850; *State v. Cade,* 215 N.C. 393, 2 S.E. 2d 7; Stansbury, N. C. Evidence § 55 (2d ed. 1963).

[2]    Defendant's thesis seems to be that the judge manifestly acted against reason when he permitted Epley to become a witness after Dr. Darrow, the psychiatrist employed at the instance of Epley's attorneys prior to his trial for murder, had testified that, in his opinion, it was impossible for Epley to give reliable testimony. This contention is untenable. The law does not say that the decision of the trial judge as to the competency of a witness shall be controlled by expert medical testimony or that the evidence of a psychiatrist, whether employed by the State or defendant, or appointed by the Court, is entitled to greater weight than that of a qualified lay witness. "Anyone who has observed another, or conversed with him, or had dealings with him, and a reasonable opportunity, based thereon, of forming an opinion satisfactory to himself as to the mental condition of such person, is permitted to give his opinion in evidence upon the issue of mental capacity, although the witness be not a psychiatrist or expert in mental disorders." *In Re Will of Brown,* 203 N.C. 347, 350, 166 S.E. 72, 74; Stansbury, N. C. Evidence § 127 (2d ed. 1963).

At the time Dr. Darrow testified, he had not seen Epley since 13 March 1968, more than a year and a half prior to the trial which we

now review. Between December 1967 and 13 March 1968, Dr. Darrow had examined Epley four times while he was in jail awaiting his own trial upon a charge of first-degree murder. During that three and one-half-month period, despite the tensions, apprehensions, and uncertainties to which he was necessarily subjected, Epley's mental condition had improved. On the *voir dire*, Judge Martin observed and questioned Epley closely. He made his observations, as well as his questions, a part of the record, and from them concluded that Epley was a competent witness. The court's decision could be set aside only for a clear abuse of discretion or upon a showing that it was based upon an erroneous conception of the law. Neither abuse of discretion nor error in law appears. Indeed, Epley's subsequent testimony and conduct in court fully justified the court's ruling on *voir dire*. Although Epley's memory as to details sometimes faltered, and there were minor inconsistencies in his evidence, as to all material matters his testimony was clear and consistent. Furthermore, it was fully corroborated by the testimony of the law-enforcement officers, his brother, and his mother. Finally, we note that the jurors also had full and ample opportunity to observe Epley, and they were charged that even though defendant counseled and commanded him to kill Benton they would acquit her unless they found that Epley had sufficient mental capacity to understand and carry out her commands and unless he actually killed Benton "as the result of such alleged acts of defendant."

In her brief, appellant asserts that the question raised by assignments of error 24, 25, and 9 is as follows: "4. Did the trial judge commit error by incorrectly charging the jury as to the mental capacity required of the principal (Epley)? (Assignments of Error Nos. 24 and 25). (a) Did the trial court commit error when it excluded evidence as to the sanity of the principal at the time the act was committed? (Assignment of Error No. 9.)" These three assignments, however, do not bring into focus the main points which defendant attempts to make.

[3] Assignments 24 and 25 respectively aver that the judge committed error "in charging the jury on the mental capacity of the principal, Raymond Epley" and that he "incorrectly charged" concerning the mental capacity of Epley. These assignments present no question for the court's determination, for they do not set out that portion of the charge which defendant contends is an erroneous statement of the law. "The appellant should quote in each assignment the part of the charge to which he objects." *State v. Wilson*, 263 N.C. 533, 534, 139 S.E. 2d 736, 737. "[A] mere reference in the assignment of error to the record page where the asserted error may be dis-

covered is not sufficient." *State v. Staten,* 271 N.C. 600, 608, 157 S.E. 2d 225, 231.

[4]    Assignment of error No. 9 is based upon an exception to the court's failure to permit Dr. Darrow to answer the following question: "Do you have an opinion as to whether or not Raymond Epley knew right from wrong on the 27th day of November, 1967?" If permitted to answer, Dr. Darrow would have said that, in his opinion, at the time of the alleged murder in November 1967, Epley "did not have the ability to know the difference between right and wrong because of his mental illness."

[5]    The objection to the foregoing question was properly sustained. Insanity will exempt an accused from criminal responsibility only if, at the time he commits the act which would otherwise be illegal, he was incapable of knowing the nature and quality of his act or of distinguishing between right and wrong with relation thereto. In other words, the question is the capacity of a defendant "to distinguish between right and wrong at the time and in respect of the matter under investigation." *State v. Jones,* 229 N.C. 596, 598, 50 S.E. 2d 723, 724. *Accord, State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241; *State v. Mercer,* 275 N.C. 108, 165 S.E. 2d 328. The question is not whether a defendant knows or knew right from wrong generally.

[6, 7]    In her brief, appellant says that she should "have had the benefit of a charge by the court to the effect that if Raymond Epley was insane at the time the alleged killing occurred, then it would be the duty of the jury to find the defendant not guilty." The record, however, fails to show that appellant excepted in any manner to the court's failure to so charge. *State v. Hill,* 266 N.C. 103, 145 S.E. 2d 346. To be effective "[a]n assignment based on failure to charge should set out the defendant's contention as to what the court should have charged." *State v. Wilson,* 263 N.C. 533, 534, 139 S.E. 2d 736, 737.

[7]    Neither assignments 24, 25 nor assignment 9 presents the question of the court's failure to charge upon Epley's alleged exemption from criminal responsibility by reason of insanity as bearing upon defendant's guilt as his accessory. However, we can perceive no prejudice to defendant from the court's failure to instruct the jury that if Epley, by reason of insanity, was not guilty of the murder of Benton then appellant could not be guilty as an accessory before the fact in the murder charged, for all the evidence tends to show that if defendant was not an accessory she was the principal felon and guilty of murder in the first degree.

[8-11]    Parties involved in the commission of a murder are either

principals or accessories. *State v. Minton,* 234 N.C. 716, 68 S.E. 2d 844. "A principal in the first degree is the person who actually perpetrates the deed either by his own hand *or through an innocent agent.*" (Emphasis added.) Any other who is actually or constructively present at the place of the crime either aiding, abetting, assisting, or advising in its commission, or is present for that purpose, is a principal in the second degree. Miller, Criminal Law §§ 73, 74, 75 (1934). *Accord, State v. Burgess,* 245 N.C. 304, 96 S.E. 2d 54; *State v. Jarrell,* 141 N.C. 722, 53 S.E. 127. In our law, however, "the distinction between principals in the first and second degrees is a distinction without a difference." Both are principals and equally guilty. *State v. Allison,* 200 N.C. 190, 194, 156 S.E. 547, 549; *accord, State v. Gaines,* 260 N.C. 228, 132 S.E. 2d 485; *State v. Peeden,* 253 N.C. 562, 117 S.E. 2d 398. An accessory before the fact is one who was absent from the scene when the crime was committed but who procured, counseled, commanded or encouraged the principal to commit it. *State v. Benton,* 275 N.C. 378, 167 S.E. 2d 775; *State v. Bass,* 255 N.C. 42, 120 S.E. 2d 580; Miller, *supra,* § 76; 22 C. J. S. *Criminal Law* § 90 (1961).

**[12, 13]**     Thus, ordinarily, the only distinction between a principal and an accessory before the fact is that the latter was not present when the crime was actually committed. In some states, by statute, all distinction between a principal and accessory before the fact has been abolished. 22 C. J. S. *Criminal Law* § 90 (1961); 1 Wharton's Criminal Law and Procedure § 110 (Anderson, 1957); 40 Am. Jur. 2d *Homicide* § 28 (1968). *See. State v. Bryson,* 173 N.C. 803, 92 S.E. 698, and the comments thereon in 41 N. C. L. Rev. 118 and *State v. Jones,* 254 N.C. 450, 119 S.E. 2d 213. Actual presence, however, becomes immaterial when a person causes a crime to be committed by an innocent agent, that is, one who is not himself legally responsible for the act. "If a person causes a crime to be committed through the instrumentality of an innocent agent, he is the principal in the crime, and punishable accordingly, although he was not present at the time and place of the offense. . . . Under such circumstances, an exception to the rules applicable to principals and accessories, in the trial of criminal cases arises *ex necessitate legis.*" 22 C. J. S. *Criminal Law* § 84(b) (1961). *Accord, State v. Minton, supra; People v. Pounds,* 336 P. 2d 219 (Calif. C/A); *Johnson v. Alabama,* 142 Ala. 70, 38 So. 182, 2 L. R. A. (NS) 897; 4 Blackstone's Commentaries, Ch. 3, p. 34; 1 Anderson, Wharton's Criminal Law and Procedure § 106 (1957); 21 Am. Jur. 2d *Criminal Law* § 21 (1965). Note, 2 L. R. A. (NS) 897 (1906).

**[14]**     Where one incites or employs a mental defective to kill an-

other the question whether the employer is guilty as a principal depends upon whether the defective was criminally responsible for his act under the McNaughten rule. "If the agent is legally responsible for his own acts, the instigator is only an accessory before the fact, if he is absent when the crime is committed. When one acts through an agent, he can himself be guilty as a principal in the first degree only when the agent is innocent." Miller, *supra*, § 74; *accord*, *People v. Adams*, 3 Denio 190 (N.Y.), 45 Am. De. 468.

**[7, 15]**  The punishment specified in G.S. 14-17 for first-degree murder is either death or imprisonment for life. Had defendant been convicted of first-degree murder she could not have received a lesser sentence than the one from which she appeals. Prima facie, she could have incurred the death penalty (but *see United States v. Jackson*, 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209, and *Pope v. United States*, 392 U.S. 651, 20 L. Ed. 2d 1317, 88 S. Ct. 2145). In any event, having been convicted as an accessory before the fact to the murder of her husband and having received a life sentence, she may not complain that she was not convicted of his first-degree murder. *State v. Bryson*, *supra* at 806, 807. At best, she could not have improved her situation.

**[16, 17]**  Defendant's assignment of error No. 26 is that the judge erred "in failing to charge the jury of the necessity of a causal relationship between the action of the accessory and the commission of the act by the principal." It is elementary that a charge must be construed "contextually as a whole," 4 Strong, N. C. Index *Trial* § 33 (1961). When so construed, it is apparent that the jurors were instructed that before they could convict defendant they must find that her request and demands that Epley murder Benton caused him to commit the crime. Furthermore, in this connection, the jurors were instructed that for the State to prove that defendant procured Epley to murder Benton it must first show that he had sufficient mental capacity to understand and carry out defendant's commands; that, lacking such capacity, he could not have killed Benton as the result of defendant's procurement, and she would not be guilty. *Inter alia*, the judge also told the jury that to be guilty as an accessory before the fact to murder "a defendant must (have) incited, procured or encouraged the commission of the crime so as to participate therein by some words or acts," and must have given instructions, directions or counsel which were "substantially followed."

We are convinced that the jury could not have misunderstood that defendant's guilt depended upon whether she "procured" Epley to murder Benton. Assignment of error No. 26 is overruled.

Defendant's fourth assignment of error is that the trial judge committed error in denying defendant's motion to strike Epley's statement that he "was in prison for the murder of Marshall Adam Benton." Immediately following this statement there appears in the transcript, "Exception No. 4." The question which elicited this answering statement is not set out. The case on appeal shows no objection to the question and no motion to strike the answer to it. Furthermore, shortly thereafter on cross-examination, counsel for defendant elicited from Epley the information "that he was charged with first degree murder and entered a plea of second degree murder for which he received a sentence of twenty (20) to thirty (30) years." We also note that at the first trial of this case in November 1968, "defendant's counsel proffered a stipulation to the effect that Raymond Epley had been indicted for the murder of Marshall Adam Benton on November 27, 1967; that, at the May 12, 1968 Session, he had tendered, and the State had accepted, a plea of guilty of murder in the second degree; and that, based on said plea, he had been sentenced to imprisonment for a term of not less than twenty nor more than thirty years." *State v. Benton,* 275 N.C. 378, 384, 167 S.E. 2d 775, 779.

Obviously, Epley's statement was not prejudicial to defendant for it is upon the fact of his conviction (plea of guilty) of murder in the second degree that defendant bases her main arguments on appeal. However, with reference to assignment No. 4 we direct attention to *Lewis v. Parker,* 268 N.C. 436, 437, 150 S.E. 2d 729, 730. There, we reiterated what we have said many times before:

**[18-21]**    "Rules 19 and 21, Rules of Practice in the Supreme Court, 254 N.C. 783, 795, 803, require that asserted error must be based on an appropriate exception, and must be properly assigned. We have repeatedly said that these rules require an assignment of error to show specifically what question is intended to be presented for consideration without the necessity of going beyond the assignment of error itself. A mere reference in the assignment of error to the record page where the asserted error may be discovered is not sufficient. . . . The rules of practice in this Court are mandatory and will be enforced. . . ." (Copious citations of authority omitted.) *See also State v. Hill,* 266 N.C. 103, 145 S.E. 2d 346; *State v. Wilson,* 263 N.C. 533, 139 S.E. 2d 736.

·The above comments are equally applicable to defendant's assignments of error 1-3, 5-7, 10-14, 22-26. *State v. Kirby,* 276 N.C. 123, 171 S.E. 2d 416.

**[22]**    By assignments of error 22 and 23 defendant challenges the

following portions of the judge's charge: "In order to convict the defendant . . . the State must prove to you beyond a reasonable doubt that Raymond Epley committed the offense of second degree murder on Marshall Benton. . . . If the State has satisfied you beyond a reasonable doubt . . . that Raymond Epley intentionally shot Marshall Adam Benton with a 30.06 rifle . . . and inflicted wounds upon Marshall Benton that caused his death, malice in that event is implied by the law and nothing else appearing Epley would be guilty of murder in the second degree, and it would be your duty to so find."

Appellant does not contend that the judge incorrectly stated the law with reference to second-degree murder. She states her thesis as follows: "If a murder is committed pursuant to the counseling, procuring, and advising of an accessory, that murder must be one which is committed with premeditation and deliberation" (murder in the first degree). For that reason "the defendant was entitled to have the jury charged on the elements of first degree murder and not second degree murder."

[23] We deduce from the foregoing that defendant's proposition is that there can be no accessory before the fact to second-degree murder. Admittedly the concept of accessory before the fact presupposes some arrangement between the accessory and the principal with respect to the commission of the crime. *State v. Bass, supra* at 51, 120 S.E. 2d at 587. It does not follow, however, that there can be no accessory before the fact to second-degree murder, which (as Judge Martin charged) imports a specific intent to do an unlawful act. Since malice, express or implied, is a constituent element of murder in *any* degree, there may be accessories before the fact to the crime of murder in both degrees. The principle is stated in Wharton on Homicide § 59 (3d ed. 1907) as follows: "There may, of course, be accessories before the fact in all kinds of murder with deliberation, or premeditation, or malice aforethought, including murder in the second degree, which involves malice." *Accord,* 1 Wharton's Criminal Law and Procedure (Anderson, 1957) § 111 and cases cited in footnote 12; *accord,* 40 Am. Jur. 2d *Homicide* § 28 (1968); 40 C. J. S. *Homicide* § 9(b) p. 839 (1944). (For comparison with manslaughter see Annots., 44 A. L. R. 576 (1926); 95 A. L. R. 2d 175 (1964); 40 Am. Jur. 2d *Homicide* § 30 (1968).

In *Jones v. State,* 13 Tex. 168, 62 Am. Dec. 550 (1854), the principal, George Jones, was indicted for murder in the first degree under a statute equivalent to G.S. 14-17. He was convicted of murder in the second degree. At the same time, Nancy Jones was convicted as

an accessory before the fact to his crime. She moved for her discharge "because there could be no accessory before the fact to murder in the second degree." In denying the motion the court said that to constitute the offense of murder in the second degree "there must be malice, and if malice, it would admit of complicity. . . . *The conclusion that we arrive at is that as murder in the second degree can only be committed with malice, that it admits of accessories,* and there was no error in refusing to discharge the appellant Nancy Jones." (Emphasis added.)

Prior to 1893 there were no degrees of murder in North Carolina. Any unlawful killing of a human being with malice aforethought, express or implied, was murder and punishable by death. *State v. Streeton,* 231 N.C. 301, 56 S.E. 2d 649; *State v. Dalton,* 178 N.C. 779, 101 S.E. 548; *State v. Rhyne,* 124 N.C. 847, 33 S.E. 128; *State v. Boon,* 1 N.C. 191. *"Malice aforethought* was a term used in defining murder prior to the time of the adoption of the statute dividing murder into degrees. As then used it did not mean an actual, express or *preconceived* disposition; but imported an intent, at the moment, to do without lawful authority, and without the pressure of necessity, that which the law forbade. *S. v. Crawford,* 13 N.C., 425. As used in C.S., 4200, now G.S. 14-17, the term *premeditation* and *deliberation* is more comprehensive and embraces all that is meant by *aforethought,* and more." *State v. Hightower,* 226 N.C. 62, 64, 36 S.E. 2d 649, 650 (emphasis added); *accord, State v. Smith,* 221 N.C. 278, 20 S.E. 2d 313; *State v. Pike,* 49 N.H. 399; 6 Am. Rep. 533.

By Ch. 85, N. C. Public Laws of 1893, in addition to felony murder, the General Assembly characterized as murder in the first degree any murder perpetrated by means of poison, lying in wait, imprisonment, starving, torture or any other kind of wilful deliberate and premeditated killing. (The latter, at common law, was murder with express malice. *State v. Steeves,* 29 Ore. 85, 43 P. 947.) All other kinds of murder were designated murders in the second degree. "Under statutes of this description, murder in the second degree is commonlaw murder but the killing is not accompanied by the distinguishing features of murder in the first degree." 40 C. J. S. *Homicide* § 35 (1944).

[22] Murder in the first degree is sometimes defined briefly as murder in the second degree plus premeditation. Thus, if Epley was guilty of murder in the first degree, a fortiori, his guilt encompassed murder in the second degree. There being no degrees of guilt *for an accessory* before the fact to murder, no possible prejudice resulted to

appellant from the challenged instructions with reference to second-degree murder.

The 1893 Act fixed the punishment for murder in the second degree at not less than two nor more than thirty years. Death remained the mandatory punishment for murder in the first degree until 1949, when the legislature provided life imprisonment as an alternative punishment if, at the time of rendering its verdict in open court, the jury shall so recommend. N. C. Sess. Laws 1949, Ch. 299 (now G.S. 14-17).

Since the enactment of N. C. Pub. Laws 1874-75, Ch. 210 (now G.S. 14-6), the law has provided that "any person who shall be convicted as an accessory before the fact in either of the crimes of murder, arson, burglary, or rape shall be imprisoned for life in the State's prison." The punishment prescribed for an accessory before the fact to any other felony (except horse or mule stealing) is a fine or imprisonment for not more than ten years.

Thus, the wording of G.S. 14-6 has remained unchanged for more than ninety-five years and for more than seventy-five years since the legislature divided murder into degrees. Notwithstanding, in addition to her contention that there can be no accessory before the fact to murder in the second degree, by assignments 17, 19, and 20, appellant contends that the statute does not authorize a life sentence for such an accessory, even conceding the possibility of his existence. She argues that the history of G.S. 14-6 manifests the legislature's intent that an accessory before the fact in murder would be sentenced to life imprisonment only when the principal was subject to the death penalty. Upon that premise she contends that the maximum punishment which can now be imposed upon an accessory before the fact in second-degree murder is ten years. Neither contention is tenable.

[24-26]    Courts will not presume that the legislature intended a repeal by implication, 50 Am. Jur. *Statutes* § 539 (1944); nor will we assume that the legislature's division of murder into degrees and reduction of the punishment for murder in the second degree implied the reduction in the sentence for an accessory before the fact in second-degree murder, which ·defendant suggests. Had the legislature intended this revision it would undoubtedly have made it *ipsissimis verbis.* It is always presumed that the legislature acted with care and deliberation and with full knowledge of prior and existing law. *State v. Lance,* 244 N.C. 455, 94 S.E. 2d 335; *Lumber Co. v. Trading Co.,* 163 N.C. 314, 79 S.E. 627; 82 C. J. S. *Statutes* § 316 (1953). Defendant's· contention that the sentence of an accessory may not exceed that of the principal in murder in the second

degree is clearly refuted by the decision in *State v. Mozingo,* 207 N.C. 247, 176 S.E. 582 (1934).

**[26]** . In *Mozingo,* the evidence tended to show that the defendant procured Fred Wade to shoot and kill Bennie Mozingo from ambush. Wade, who was awaiting trial as the principal in the murder, testified against defendant as a witness for the State. Defendant was convicted as an accessory before the fact to murder and sentenced to life imprisonment. Thereafter Wade was allowed to plead guilty to murder in the second degree and received a term of thirty years. Upon appeal, the defendant complained that his sentence as an accessory was for life while that of the principal was only thirty years. The Court disposed of this complaint summarily:

"It is sufficient to say that both the judgment against the defendant and the judgment against Fred Wade are authorized by statute. C.S. 4171, and C.S. 4200. The statute prescribing imprisonment for life upon conviction as an accessory before the fact to the crime of murder was in force at the time the statute defining murder in the first degree and murder in the second degree, respectively, and prescribing the punishment upon a conviction of murder in the first degree as death and the punishment upon a conviction of murder in the second degree as imprisonment for not less than two nor more than thirty years, was enacted. The former statute has not been amended or repealed. It is now in full force and effect." *Id.* at 250, 176 S.E. at 583.

**[27]** From the silence of the legislature we may assume that the lawmaking body was satisfied with the interpretation this Court has placed upon G.S. 14-6, and that the punishment for an accessory before the fact to a murder in any degree remains imprisonment for life. *Hewett v. Garrett,* 274 N.C. 356, 163 S.E. 2d 372; 50 Am. Jur. *Statutes* § 326 (1944).

**[28, 29]** Defendant's assignment of error No. 18 is that a life sentence for second-degree murder is constitutionally impermissible in that it (1) constitutes cruel and unusual punishment and (2) denies her the equal protection of the laws in violation of the Fourteenth Amendment. We dispose of the first contention, that defendant's life sentence is cruel and unusual punishment, by saying that it is the punishment fixed by the applicable statute, and that it is not disproportionate to her offense or unduly harsh in comparison with Epley's sentence. In this case — as is often true, no doubt — the culpability of the accessory exceeds that of the principal. *See State v. Robinson,* 271 N.C. 448, 156 S.E. 2d 854; *State v. Greer,* 270 N.C. 143, 153 S.E. 2d 849; *State v. Elliott,* 269 N.C. 683, 153

S.E. 2d 330; 24B C. J. S. *Criminal Law* § 1978 (1962). As to the second contention, the rule is well established that "equal protection of the laws is not denied by a statute prescribing the punishment to be inflicted on a person convicted of crime unless it prescribes different punishment for the same acts committed under the same circumstances by persons in like situation." 16A C. J. S. *Constitutional Law* § 564 (1956). *Accord, State v. Fowler*, 193 N.C. 290, 136 S.E. 709. G.S. 14-6 specifies life imprisonment for all persons convicted as accessories before the fact in the crime of murder.

There is no assignment No. 15; assignment of error No. 16 is formal. Assignment No. 8 (to the denial of the motion for nonsuit) and assignment No. 21 (to the overruling of the motion in arrest of judgment), being patently without substance, were not brought forward. Assignments 5-7 and 10-14 are not deemed to merit discussion.

[30] Because this appeal is from the second trial of a serious felony, we have considered every assignment of error which defendant attempted to bring forward notwithstanding appellant's failure to comply with our rules in many instances. However, we again point out that our rules are applicable to indigent defendants and their court-appointed counsel as well as to all others, and that the obligations of court-appointed counsel to his client and to the court are no less than those of privately retained counsel. *State v. Aycoth*, 272 N.C. 48, 157 S.E. 2d 655; *State v. Price*, 265 N.C. 703, 144 S.E. 2d 865.

[31] Today, an unsuccessful appeal in a criminal case — it matters not how skillfully and vigorously prosecuted or that the appeal may have been totally devoid of merit — is often followed by irresponsible and unjustified charges from the prisoner that his "court-appointed counsel was incompetent." Clearly, a failure on the part of attorneys to comply with the rules of the appellate courts invite such charges. To forestall these accusations against competent lawyers, who have nevertheless neglected to familiarize themselves with our rules, we have indulged lately infractions which formerly would not have been countenanced. However, we cannot be expected to continue this practice, which is neither in the interest of the Court nor the Bar.

In this case, after having carefully considered every assignment of error, we find in the trial below

No error.