STATE v. CLAUDE ABSHER.

(Filed 6 November, 1946.)

**1. Homicide § 11—**

In order to justify a killing in self-defense, defendant must be under reasonable apprehension of death or great bodily harm under the circumstances as they appear to him at the time, which subjective apprehension perforce is predicated upon the exercise of reason, and is therefore necessarily beyond the capacity of a person too drunk to have any conscious mental processes.

**2. Homicide § 27f—**

Where defendant testifies that he became so intoxicated that he had no remembrance of anything that happened for some time prior and subsequent to the homicide, the court is not required to submit to the jury the question of self-defense, notwithstanding testimony on the part of the State's witnesses that defendant knew what he was doing, since even the evidence that defendant knew what he was doing, standing alone, fails to lay the necessary predicate that defendant reasonably apprehended he was in danger of death or great bodily harm.

**3. Homicide §§ 10c, 27b—**

A charge which properly places the burden upon defendant to establish his contention of drunkenness rendering him incapable of premeditation and deliberation, but then further charges that the burden is on defendant to establish the matter to the satisfaction of the jury "in order for him to mitigate the offense," must be held for error, since the burden of establishing premeditation and deliberation beyond a reasonable doubt rests upon the State throughout, and defendant in no event has the burden of establishing matters mitigating the offense from first degree to second degree murder.

**4. Criminal Law § 81c (2)—**

Where the charge contains a correct and an incorrect instruction relating to the burden of proof, the error cannot be held harmless by the application of the rule of contextual construction.

APPEAL by defendant from *Phillips, J.,* at August Term, 1946, of WILKES.

The appellant, Claude Absher, was charged with the murder of Clyde Watts, was convicted of murder in the first degree, and from the sentence of death imposed, appealed to this Court. The case history in so far as it affects the disposition of this appeal is substantially as follows:

Watts was a soldier in the United States Army, engaged in the European Theatre for some four years. During that time the defendant, Absher, was frequently in company with Josie Watts, wife of deceased, and admittedly having immoral relations with her. Meantime, Watts had been discharged from the army for about two months before the occurrence ·immediately leading to his death, and had returned to his home in North Wilkesboro where all the parties were living. On ·the evening of the day in which events culminated, Watts, while standing across the street with a number of companions, amongst them Earl Watts, his brother, Quincy Parker, Parks Robertson, and Jack Anderson, observed Absher and Mrs. Josie Watts standing near the bank building engaged in conversation. Followed by the above named persons, he went across the street and charged Absher with breaking up his home. A struggle ensued between Watts and his wife in which Mrs. Watts took her husband by the hair and exclaimed that she was "going to get a warrant for every damned one of them." Watts proposed to accompany her to the Mayor's office and they both started in that direction.

The State's evidence tended to show that Absher, expressing his love for "that damned woman," started to follow. Anderson interfered and told him not to follow them. In the altercation which followed, Anderson knocked or slapped Absher to the sidewalk. The evidence tended to show that the defendant, at some point in this melee, had drawn a knife. The parties finally separated, Absher declaring he would return, and going off in the direction of the Call Hotel.

Absher was not seen by Clyde Watts for about 30 minutes, during which, Earl Watts, Anderson, Quincy Parker, Parks Robertson walked about without any particular objective, as they contended, and drank quantities of whiskey. They finally decided to see if they could find Clyde and his wife and walked back down the street, where they were joined by Clyde Watts and Coy Adkins. They finally approached Brame's Drug Store near which the previous altercation had occurred. There Clyde Watts saw the defendant on the opposite side of the street and "hollered" at him: "I want to see you a minute." Absher was standing near the taxicab stand and Watts went straight across the street and approached him. The group which had accompanied him converged on the scene from different angles. When Clyde Watts was about 25 or 30 feet from Absher, the latter, first pointing the gun at Earl Watts, then turned it upon Clyde Watts and shot him in the belly, the load striking a little below the level of the navel on the right side and inflicting a wound from which Watts died shortly thereafter.

After Clyde Watts was shot, Absher made a motion as if to reload the gun and he and Earl Watts struggled on the sidewalk until the gun was recovered by someone else. An officer arrived and Absher was taken into custody. The evidence is to the effect that Watts was unarmed throughout the difficulty.

Testifying in his own behalf, defendant said that after the first encounter near the bank in which he was knocked to the sidewalk, he went to the Call Hotel where he drank a great quantity of whiskey, so much in fact that after the last drink there, his mind was a perfect blank; and he now had no memory whatever of anything that occurred thereafter until he was awakened in jail about midnight and learned that Watts had been shot and killed. W. C. Sloop, taxicab driver and witness for the State, testified to the conduct of defendant during a part of the amnesic period. He testified that defendant approached his cab in front of the hotel and engaged witness to carry him to his home, about a mile away. Arriving there, defendant told him to turn around and wait for him. This the witness did; and in a short time defendant came out and got in the back seat of the cab. After some difference between them about which street they should take, witness drove defendant to a point a short distance from where the homicide took place. As defendant got out of the car, witness discovered that he was carrying a shotgun. Absher exclaimed, "Now where is he at," or "Now where is the s. o. b. at?" and went in a fast walk up toward Brame's Drug Store.

In rebuttal of defendant's testimony that he could remember nothing that happened from the time he took the last drink at the hotel until he was awakened in the jail after the fatal occurrence, the State offered evidence from witnesses who had observed him at various times during that period, particularly at the time of his arrest, who testified that in their opinion defendant knew what he was doing.

Omitted from this statement is any attempt at a categorical mention of objections to the evidence and of exceptions to the judge's charge not concerned with the basis of decision. Where pertinent to the discussion, exception to the instructions given and objection for the want of proper instructions will be specifically treated in the body of the opinion.

The jury returned a verdict of guilty of murder in the first degree and from the sentence of death imposed, the defendant, as noted, appealed, making some 94 assignments of error.

*Attorney-General McMullan and Assistant Attorneys-General Bruton, Rhodes, and Moody for the State.*

*Trivette, Holshouser & Mitchell and Hayes & Hayes for defendant, appellant.*

SEAWELL, J. The prime purpose of appellate review is to discover and correct prejudicial error. Often its correction necessitates a new trial; but it is not mandatory on the appellate court to treat separately 94 exceptions to the trial, all, allegedly, involving as many fatal errors, or to furnish a complete pattern for a new trial. Out of the objections to the conduct of the trial, a few of which may be meritorious, and a great many no doubt taken as an anchor to windward, we consider two, more deeply based and at the same time more prominently thrown up from the melange of the legal battle.

On the first of these the Court does not stand with the appellant. The objection is that the trial court failed to recognize defendant's right of self-defense, under the circumstances developed in the whole evidence, and to give the jury appropriate instructions thereupon.

Without going into the refinements with which time, place, and circumstance qualify the right, a person is justified in taking the life of an assailant in self-defense under a reasonable apprehension of death or great bodily harm. It is the reasonableness of the apprehension, as it must have appeared to the defendant at the time of the act, that justifies the homicide. *S. v. Robinson,* 213 N. C., 273, 279, 196 S. E., 366.

The defendant stated that he remembered nothing of what occurred after he had imbibed the last drink of white corn liquor at the hotel until he was awakened in jail after the killing. This covered the period during which the evidence tends to show he went home and procured the shotgun, returned and shot Watts. We are asked to infer from this amnesia and the drunkenness which caused it, that during this critical period defendant's reasoning faculties were so affected that he was incapable of premeditation or deliberation; but it is suggested that he might be still left with enough reason to appreciate or appraise physical danger and react to it rationally. But if such an anomalous condition

could exist, defendant's sweeping abnegation—the "blackout"—provides no stops for its consideration unless we resort to speculation *vice et contra* inference from the evidence. Under the "blackout" theory advanced by appellant and relevant testimony it is difficult to perceive how defendant could have had any apprehension at all, much less one which the law regards as extenuating only when tempered with reason. It is argued here that even an animal may have an instinct that warns him of impending menace to life; but the law of self-defense and justifiable homicide is not framed upon the facts of animal instinct and behavior, but upon the reason and accountability of man. It probes the motive behind the act. Its extenuation or justification does not rest so much in the objective circumstances staging the homicide as in the subjective apprehension of death or great bodily harm, which is reasonably aroused by them. The apprehension is morally and legally inseparable from the exercise of reason.

Witnesses for the State testified that they were of the opinion Absher knew what he was doing. Witnesses to the facts testified to conversation and behavior on the part of Absher from which a like inference may be drawn. Is this to be taken by the Court as contradicting the defendant about the "blackout" and giving him the right to claim that he killed Watts in a reasonable apprehension of death or great bodily harm? That the circumstances were such that he ought to have felt that way about it anyway, if normal, and thus, willy nilly, force him from the defense of drunken irresponsibility to the plea of self-defense? We are asked to give the defendant the benefit of a theory which is negatived by his own testimony and to credit him with reactions which he does not profess to have had, and which no evidence in the record, standing alone, is sufficient to impute to him. Upon this record the defendant is not entitled to the desired instruction relating to self-defense.

But the second objection we notice merits a new trial. The defendant had pleaded drunkenness at the time of the homicide to an extent which so affected his reason as to make it impossible for him to premeditate or deliberate the taking of life within the statutory definition of first degree murder and necessary to his conviction of that offense. On this point the trial court instructed the jury:

"To make such defense available, the evidence must show that at the time of the killing the prisoner's mind and reason was so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill. As the doctrine is one that is dangerous in its application, it is allowed only in very clear cases; and where the evidence was that the purpose to kill was deliberately and premeditatedly formed when sober, the imbibing of intoxicants to whatever extent, in order to carry out the design, will not avail as a defense; and the Court charges you, gentlemen of the jury, when a

defendant interposes a plea of drunkenness, that the burden of proving such plea is upon him, not beyond a reasonable doubt and not by the greater weight of the evidence, but simply to the satisfaction of the jury, in order for him to mitigate the offence."

The fault in this instruction does not lie in putting on the defendant the burden of establishing the affirmative defense of drunkenness and incapacity to deliberate to the satisfaction of the jury; *S. v. Cureton,* 218 N. C., 491, 11 S. E. (2d), 469; *S. v. Bracy,* 215 N. C., 248, 256, 1 S. E. (2d), 841; *S. v. Shelton,* 164 N. C., 513, 79 S. E., 883; but in the language used to explain its legitimate use and effect:—"in order for him to mitigate the offence." The office of the plea and evidence supporting it is to rebut the evidence of the State tending to show deliberation, and thus defeat conviction of first degree murder, which can only be had on proof beyond a reasonable doubt of this essential element, and not to mitigate an offense already chalked up against the defendant, either through assumption by the court or presumption of law.

There is, of course, another sort of presumption with which the defendant must, *imprimis,* contend—that of normal understanding, or sanity, which prevails until the contrary is shown; *S. v. Cureton, supra; S. v. Shelton, supra;* but the exception does not invite its discussion.

It may have been the purpose of the court to array the evidence of defendant's incapacity to deliberate against evidence of the State tending to show deliberation, but the phraseology will scarcely admit of that construction; and we do not think its prejudicial tendency is relieved by construing the charge contextually, although, in another part of it the burden was properly placed on the State to prove premeditation and deliberation beyond a reasonable doubt.

In the hope that the next trial will prove less challengeable, we refrain from comment on the other 92 assignments of error. For the reasons stated, however, the appellant is entitled to a new trial. It is so ordered.

New trial.