STATE OF NORTH CAROLINA v. ROGER LAWRENCE WETMORE

No. 47

(Filed 6 June 1975)

1. Jury § 5— reexamination and challenge of jurors accepted by both sides

In this homicide prosecution, the trial court did not err in permitting the district attorney to reexamine and challenge for cause a prospective juror and to reexamine and challenge peremptorily a second prospective juror after both had been passed by the State and by

State v. Wetmore

defendant but before the jury was impaneled where the court was informed that the first juror had formed an opinion as to defendant's guilt and the juror stated she now believed defendant was not guilty by reason of insanity, and where the second juror had initially indicated he only knew defendant casually, the court was informed the juror was a good friend of defendant and his family, and upon re-examination the juror admitted that defendant and his son were the best of friends and that he knew defendant quite well.

**2. Witnesses § 1— competency of witness**

The competency of a witness to testify is to be determined at the time the witness is called to testify and rests mainly, if not entirely, in the sound discretion of the trial judge in the light of his examination and observation of the particular witness.

**3. Witnesses § 1— competency of State's witness — motion for new trial**

The trial court in a homicide case did not err in failing to grant defendant a new trial because of the incompetency of a State's witness after having heard the witness testify and a psychiatrist testify that the witness was suffering from a mental illness known as chronic paranoid schizophrenia where the testimony of the witness, though long and rambling at times, was clear and consistent on all material matters and was fully corroborated by defendant, the local police, and S.B.I. agents.

**4. Homicide § 24— death from intentional use of deadly weapon — presumptions**

The trial court did not err in instructing the jury that if the State proved beyond a reasonable doubt that defendant intentionally killed the deceased with a deadly weapon then "the law raises two presumptions: first, that the killing was unlawful, and second, that it was done with malice."

**5. Criminal Law § 115; Homicide § 23— instructions — not guilty verdict — insanity — failure of State's proof**

When construed as a whole, the charge of the court in this homicide case did not limit the jury's permissible not guilty verdict to a verdict of "not guilty by reason of insanity" and foreclose the possibility of a verdict of "not guilty" by virtue of possible failings in the State's case.

**6. Criminal Law § 5; Homicide §§ 7, 28— mental disease — effect on premeditation and deliberation — failure to instruct**

The trial court in this first degree murder case did not err in failing to charge that insanity which precludes the mental process of premeditation and deliberation is a defense to a charge of first degree murder and that if as a result of mental defect of reasoning the defendant did not have the required specific intent to kill, defendant should be found not guilty of first degree murder.

**7. Criminal Law § 5— irresistible impulse doctrine**

The irresistible impulse doctrine is not recognized by the courts of this State.

**8. Constitutional Law § 36; Criminal Law § 135; Homicide § 31— death penalty for first degree murder**

Imposition of the death penalty for first degree murder did not violate defendant's guarantee against cruel and unusual punishment or deprive him of equal protection of the law.

Chief Justice SHARP concurring in part and dissenting in part.

Justices COPELAND and EXUM dissenting as to death sentence.

APPEAL by defendant from *Peel, J.,* at the July 1974 Term of ROWAN Superior Court.

On indictment proper in form, defendant was convicted of the first degree murder of his father, Edwin Hall Wetmore. Defendant appeals from judgment imposing a sentence of death.

Evidence for the State tends to show: On Friday, 8 February 1974, deceased came home from work at the Veterans Administration Hospital (V.A. Hospital) in Salisbury at about 4:45 p.m. After supper, he and his wife Dorothy read the newspaper and watched television. They went to bed about 9:00 or 9:30 p.m. About 11:30 p.m. they were awakened by defendant's knocks on their locked bedroom door. When the door was opened, defendant entered and told his father to put on his clothes because they were going to the V.A. Hospital. Defendant called his father a "queer" and they began fighting. At first, the two men fought with their fists, but defendant procured a scout knife and stabbed his father "more than once." Mrs. Wetmore saw "a good bit" of blood.

Defendant then compelled his mother to help him drag the body into the kitchen. He then cleaned his scout knife and took it to his room where Mrs. Wetmore had seen it before. He also took the rug which had blood on it out of the bedroom.

Defendant and his mother then loaded the body onto a pickup truck. She went back to the kitchen in a state of shock. While there she heard the sound of metal coming from the back yard but at no time saw an axe. As she was wiping up blood in the kitchen, defendant came in and said he wanted to take the body to the ball park at the V.A. Hospital (Kelsey Park) so it would look like a mental patient had killed his father. He drove the truck to Kelsey Park and left it, returning in a car driven by his mother, who had followed him. Upon returning home, they cleaned the house for an hour or two. Mrs. Wetmore washed defendant's bloodstained shirt, jeans and tennis shoes.

State v. Wetmore

Defendant removed several bloodstained shingles from the side of the house. He said something to his mother about putting an axe in a pond near the house.

At 5:00 p.m. on Monday, 11 February 1974, defendant and his brother Jerry Wetmore went to the Salisbury Police Department and told Sergeant J. L. Hurley that their father had been missing and that they had located his body in the back of a truck at Kelsey Park. Sergeant Hurley accompanied defendant and Jerry Wetmore to Kelsey Park where he was shown the body of deceased.

At 4:45 a.m. on Tuesday, 12 February 1974, agents of the State Bureau of Investigation searched the Wetmore house with the consent of Mrs. Wetmore and found a boy scout knife with a brownish substance on it in a chest of drawers in defendant's bedroom.

At approximately 8:30 p.m. on Wednesday, 13 February 1974, Mrs. Wetmore, frightened because defendant appeared "extremely nervous," made a statement to agents of the State Bureau of Investigation which was introduced at trial to corroborate her testimony. Agents returned to the Wetmore house at about 2:00 p.m. on Thursday, 14 February 1974, and, again with Mrs. Wetmore's permission, searched the premises. The agents found an axe in a pond about one-half mile from the house and a bedroom rug on a trash pile five to six hundred yards from the house.

Analysis of the scout knife showed the brownish substance to be human blood of indeterminate blood type. Analysis of the head of the axe taken from the pond revealed numerous white and brown Caucasian head hairs. Analysis of reddish brown stains on the bedroom rug showed them to be human blood of blood group O, the blood group of deceased.

Dr. Elizabeth Mayrand performed an autopsy on deceased at 9:30 p.m. on 11 February 1974. The body had 43 stab wounds and the head was almost completely dismembered from the body. Death was caused by numerous stab wounds in the chest.

Evidence for defendant tends to show: Defendant testified that he was not in control of his mental or bodily faculties at the time he killed his father; rather, a computer at a star ship base was in control of them. Defendant felt it was his duty to

kill his father since his father was in control of a star ship base on this planet and was teaching defendant to become a dictator. Due to the computer's influence, defendant did not feel he had a choice when he killed his father. He stated that he stabbed his father many times to be sure he was dead; that he knew it was against the law to kill his father but at the time of the killing did not think it was wrong; that if he had known it was wrong he would not have done it; and that he tried to cover up the killing because he wanted to be able to proceed to a star ship. He also stated that he had planned to kill his father for about one week and decided then how he was going to do it and cover it up. He further testified: "I knew destroying my father was wrong. My mother wanted to leave the body at the house and say it was self defense but I thought it better to take it to Kelsey Park."

Warren Owen, a friend from high school, testified that defendant told him life existed on other planets; that Hickory, North Carolina, was being used as a star ship base; and that defendant and a boy from Myrtle Beach were trainees of these creatures.

David Long, jailer at the Rowan County Sheriff's Department, testified that while defendant was in jail during February 1974 he carried on conversations with imaginary people and showed signs of hallucination.

Dr. Robert L. Rollins, Director of the Forensic Unit at Dorothea Dix Hospital in Raleigh, evaluated defendant at Dorothea Dix during February and March 1974. Dr. Rollins testified that, in his opinion, defendant is of above average intelligence, but is suffering from a mental illness known as acute schizophrenic reaction; that at the time he killed his father he was not laboring under such a defect of reason from disease of the mind as to be incapable of knowing the nature and quality of his acts; that he was aware of what he was doing and the harmfulness of his acts to his father; that he meant to kill his father; and that at the time of the killing he did not know right from wrong with respect to the decision to kill his father. Further, in his opinion defendant was not trying to simulate insanity.

Dr. Rollins further testified that in his opinion defendant attempted to cover up this crime for two reasons: First, he appreciated that there were members of the community who did not accept his beliefs about the space conspiracy, and that these

State v. Wetmore

people very likely would apprehend him and put him in jail; and, second, he felt that if this happened he would not be able to carry out his mission to search for this space ship base. Defendant made this elaborate plan to cover up the killing of his father even before he killed him for the same reasons. Dr. Rollins did not believe the defendant would have killed his father if a police officer had been standing there because defendant knew the police officer would consider it wrong.

Dr. Rollins also testified:

" . . . [I]t was my opinion that Mr. Wetmore . . . was competent to stand trial, using the criteria that he knew what he was charged with, he knew the possible consequences if he were convicted, and I felt he was able to cooperate with his attorney."

*Attorney General Rufus L. Edmisten and Assistant Attorney General George W. Boylan for the State.*

*Robert M. Davis and Larry G. Ford for defendant appellant.*

MOORE, Justice.

[1] Defendant first assigns as error the action of the trial judge in permitting the district attorney to reexamine and challenge for cause Mrs. Brady, a prospective juror, and to reexamine and challenge peremptorily Mr. Crisp, another prospective juror, after both had been passed by the district attorney and counsel for defendant.

Before the State passed Mrs. Brady, she stated she had not formed an opinion as to defendant's guilt or innocence. However, before the jury was finally selected and impaneled, the trial court was informed that Mrs. Brady had formed an opinion as to defendant's sanity. On further examination, Mrs. Brady stated she now believed defendant was insane at the time of the homicide and was not guilty of the crime charged by reason of insanity. Over objection, this juror was excused by the State for cause.

Before the State passed Mr. Crisp, he indicated he only knew defendant casually. Before the jury was impaneled, the court was informed that Mr. Crisp was a good friend of defendant and his family. Upon reexamination, this juror admitted

State v. Wetmore

that defendant visited his son at their home two or three times each week, that defendant and his son were the best of friends, and that he knew defendant quite well. The State, over objection, then excused Mr. Crisp peremptorily.

In *State v. Westbrook*, 279 N.C. 18, 181 S.E. 2d 572 (1971), defendant was on trial for murder. The trial judge excused a juror on the grounds of family hardship. The circumstances constituting the hardship came to the trial judge's attention after the juror had been accepted by both the State and the defendant and had been sworn but not impaneled. We held that the trial judge's action did not constitute error.

In *State v. Harris*, 283 N.C. 46, 194 S.E. 2d 796 (1973), defendant assigned as error the action of the trial judge in permitting the solicitor to reexamine and successfully challenge for cause a prospective juror who had been passed by the State and tendered to defendant. Before the State passed and tendered this juror, she indicated her willingness to vote for a verdict which would result in the death penalty. Prior to jury impanelment, however, she let it be known that she had changed her opinion about capital punishment. The trial judge thereupon allowed the solicitor to reexamine the prospective juror. The reexamination revealed that she had talked with her pastor during the overnight recess and as a result of that conversation she would not, under any circumstances, vote for a verdict which would impose the death sentence. Over objection, the trial judge allowed the solicitor to successfully challenge her for cause. We approved stating:

> "The competency of jurors is a matter to be decided by the trial judge. Decisions as to a juror's competency at the time of selection and their continued competency to serve are matters resting in the trial judge's sound discretion. G.S. 9-14; *State v. Johnson*, 280 N.C. 281, 185 S.E. 2d 698. The trial judge's ruling on such questions are [sic] not subject to review on appeal unless accompanied by some imputed error of law. *State v. Watson*, 281 N.C. 221, 188 S.E. 2d 289."

*See also State v. Atkinson*, 275 N.C. 288, 167 S.E. 2d 241 (1969); *State v. Spence*, 271 N.C. 23, 155 S.E. 2d 802 (1967).

The solicitor did not attempt to challenge Mr. Crisp for cause, but challenged him peremptorily. Peremptory challenges are challenges that may be made according to the judgment

of the party entitled thereto without being required to assign the reason therefor, and the reason for challenging a juror peremptorily cannot be inquired into. *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974) ; *State v. Allred,* 275 N.C. 554, 169 S.E. 2d 833 (1969).

The court did not abuse its discretion in allowing the district attorney to reexamine these prospective jurors and in excusing one for cause and the other peremptorily. This assignment is overruled.

Defendant's second assignment of error is directed to the court's refusal to disqualify the witness Mrs. Dorothy Wetmore. Defendant contends that this witness was not mentally competent to testify in that her testimony showed that her thought process was extremely confused and that she was motivated by delusional thinking that her husband was out to get her. Dr. Robert L. Rollins, a qualified psychiatrist and head of the Forensic Unit at Dorothea Dix Hospital, testified that she was suffering from a mental illness known as chronic paranoid schizophrenia.

Defendant did not object to Mrs. Wetmore's competency as a witness or to her testimony during the trial, but after verdict and after sentence had been pronounced, he moved for a new trial for the reason that Mrs. Wetmore was mentally incompetent. Defendant contends that the trial judge abused his discretion in allowing Mrs. Wetmore's testimony to stand after he heard her and Dr. Rollins testify.

In *State v. Benton,* 276 N.C. 641, 174 S.E. 2d 793 (1970), defendant contended that the court erred in allowing one Epley to testify after a psychiatrist testified that in his opinion it was impossible for Epley to give reliable testimony. In overruling this contention, Justice Sharp, now Chief Justice, speaking for the Court said:

"  . . . The law does not say that the decision of the trial judge as to the competency of a witness shall be controlled by expert medical testimony or that the evidence of a psychiatrist, whether employed by the State or defendant, or appointed by the Court, is entitled to greater weight than that of a qualified lay witness. . . . " *Id.* at 650, 174 S.E. 2d at 799.

In *State v. Robinson,* 283 N.C. 71, 194 S.E. 2d 811 (1973), the defendant contended that the court erred in failing to find that the State's witness Tinsley lacked sufficient mental capacity to be permitted to testify. We held that there was no merit in this contention, quoting with approval from *State v. Benton, supra,* as follows:

> " 'Unsoundness of mind does not per se render a witness incompetent, the general rule being that a lunatic or weak-minded person is admissible as a witness if he has sufficient understanding to apprehend the obligation of an oath and is capable of giving a correct account of the matters which he has seen or heard with respect to the questions at issue. The decision as to the competency of such a person to testify rests largely within the discretion of the trial court.' Accord: *State v. Squires,* 265 N.C. 388, 144 S.E. 2d 49; *State v. Cade,* 215 N.C. 393, 2 S.E. 2d 7; Stansbury, North Carolina Evidence, 2d Ed., § 55; 97 C.J.S., Witnesses, § 57(b)."

And, " . . . [i]t is the consensus that mental eccentricities or aberrations which fall short of complete mental incapacity do not render a witness incompetent, although they may affect his credibility." 3 Jones on Evidence § 20:13, pp. 614-15 (6th ed. 1972).

In *State v. Merrick,* 172 N.C. 870, 90 S.E. 257 (1916), as in the present case, defendant did not object to the testimony of a witness but at the conclusion of the testimony moved to strike. There we stated: " . . . An objection to testimony not taken in apt time is waived. [Citations omitted.] When testimony has thus been admitted without objection, the granting or denying a motion to strike out rests in the discretion of the court. [Citations omitted.] . . . . "

[2]  We have held many times that the competency of a witness to testify is to be determined *at the time the witness is called to testify* and rests mainly, if not entirely, in the sound discretion of the trial judge in the light of his examination and observation of the particular witness. 7 Strong, N. C. Index 2d, Witnesses § 1 (1968) ; *State v. Cooke,* 278 N.C. 288, 179 S.E. 2d 365 (1971) ; *State v. Bowden,* 272 N.C. 481, 158 S.E. 2d 493 (1968) ; *State v. Turner,* 268 N.C. 225, 150 S.E. 2d 406 (1966) ; *Artesani v. Gritton,* 252 N.C. 463, 113 S.E. 2d 895 (1960) ; *State v. Merritt,* 236 N.C. 363, 72 S.E. 2d 754 (1952).

**[3]**  Defendant waited too late to challenge the competency of Mrs. Wetmore, but assuming that his objections to her competency were timely made, we hold that defendant's motion was properly denied. Mrs. Wetmore's trial testimony, although long and rambling at times, was clear and consistent on all material matters and was fully corroborated by defendant, the local police, and S.B.I. agents. The trial judge had a firsthand opportunity to observe her demeanor, sincerity, perception and memory. There is nothing in the record to indicate that the trial judge abused his discretion in failing to grant defendant a new trial because of Mrs. Wetmore's incompetency to testify.

**[4]**  Defendant next assigns as error that portion of the charge in which the trial court instructed the jury that if the State proved beyond a reasonable doubt that the defendant intentionally killed the deceased with a deadly weapon then "the law raises two presumptions: first, that the killing was unlawful, and second, that it was done with malice."

Defendant's counsel, with commendable candor, states in his brief:

> "Defendant is aware that the instructions complained of here are consistent with the case law of this state. Malice and unlawfulness of the . killing are presumed, when a deadly weapon is intentionally used; 4 STRONG INDEX, 2d Homicide, Sec. 14, pp. 207-209. The burden is upon the defendant to disprove malice and reduce a killing to voluntary manslaughter. STATE v. ABSHER, 226 N.C. 656, 40 S.E. 2d 26 (1946). Your defendant contends these rules are no longer valid in this society . . . .
>
> \*　　\*　　\*
>
> " . . . The defendant is aware that this Court recently rejected this same argument in the case of STATE v. SPARKS, 285 N.C. 631 (1974)."

Defendant is correct. We did reject this argument in *Sparks,* and we adhere to that decision. We need only repeat what we said in *Sparks, supra,* at 644, 207 S.E. 2d at 719:

> " . . . We have carefully considered defendant's argument that we should change our well-established rule. However, we are not persuaded to do so. See *State v. Jennings,* [276 N.C. 157, 171 S.E. 2d 447 (1970)]; *State v. Propst* [274 N.C. 62, 161 S.E. 2d 560 (1968)]."

This assignment is overruled.

**[5]**   The trial court also charged:

> "The defendant has the burden of proving he was insane. However, unlike the State which must prove the defendant's guilt beyond a reasonable doubt, the defendant need only prove his insanity to your satisfaction.

> "Therefore, I charge that if you are satisfied from the evidence that the defendant, at the time of the alleged crime, and as the result of mental disease or defect, either did not know the nature and quality of his act, or did not know that it was wrong, he would be not guilty.

> "If you find the defendant not guilty for this reason, but otherwise would have found him guilty, you must find him not guilty by reason of insanity."

Defendant contends that the foregoing instructions in effect limited the jury's permissible not guilty verdict to only a verdict of "not guilty by reason of insanity" and foreclosed the possibility of a verdict of "not guilty" by virtue of possible failings in the State's case. This contention is without merit. On several occasions the trial judge instructed the jury that it might return either of five permissible verdicts and at one time told them that throughout their deliberations they would have a written list designating those verdicts. He clearly stated:

> "Under this charge and the evidence in this case, there are five possible verdicts that you can arrive at. First is guilty of First Degree Murder, second is guilty of Second Degree Murder, third is guilty of Voluntary Manslaughter, *the fourth is not guilty,* and *the fifth is not guilty by reason of insanity.*

> "And it has been agreed, members of the jury, by counsel for the State and for the defendant that I might submit to you, when you go to your room, a list of the possible verdicts which you can use in your deliberations and in returning your verdict in open Court. Your verdict would be a verbal or oral verdict, but you could use this list as it has been agreed." (Emphasis added.)

Again, immediately before that portion of the charge to which defendant objected, the trial judge carefully recited the substantive elements required to be found by the jury before

State v. Wetmore

it could return a verdict of guilty of either first degree murder, second degree murder or manslaughter, and then said: "However, if you do not so find or have a reasonable doubt as to one or more of these things, you will return as your verdict a verdict of not guilty." Following this, the judge charged upon the effect to be given defendant's allegations of mental impairment and then stated: "If you find the defendant not guilty for this reason, but otherwise would have found him guilty, you must find him not guilty by reason of insanity."

Immediately before the jury retired to deliberate, the judge again charged that it might return verdicts of not guilty on all of the offenses charged or not guilty by reason of insanity. This instruction was repeated when the jury returned and asked for additional instructions. " . . . The charge of the court must be read as a whole. *State v. Wilson,* 176 N.C. 751, 97 S.E. 496 (1918). A disconnected portion may not be detached from the context of the charge and then critically examined for an interpretation from which erroneous expressions may be inferred. *State v. Gatling,* 275 N.C. 625, 170 S.E. 2d 593 (1969); *State v. McWilliams* [277 N.C. 680, 178 S.E. 2d 476 (1971)]; *State v. Alexander,* 279 N.C. 527, 184 S.E. 2d 274 (1971)." *State v. Bailey,* 280 N.C. 264, 185 S.E. 2d 683 (1972). *See* 3 Strong, N. C. Index 2d, Criminal Law § 168 (1967).

Construing the charge as a whole, we hold that the trial court properly protected the rights of defendant by instructing the jury to return a verdict of "not guilty" if possessed of any reasonable doubt as to the sufficiency of the State's case, and further by instructing the jury to return a verdict of "not guilty by reason of insanity" if convinced, regardless of the sufficiency of the State's case, that the defendant at the time of the alleged crime, and as the result of a mental disease or defect, did not know the nature and quality of his act or did not know that it was wrong.

Next, defendant assigns as error the court's final mandate to the jury.

Defendant contends that this portion of the charge is conflicting on several material points. We have carefully examined the objected to portion of the charge and fail to detect any such conflict. The instruction complies with settled law in this State. *State v. Woods,* 278 N.C. 210, 179 S.E. 2d 358 (1971); *State*

*v. Propst, supra; State v. Gordon,* 241 N.C. 356, 85 S.E. 2d 322 (1955). This assignment of error is overruled.

**[6]** Defendant further contends that the court should have instructed the jury as follows regarding his mental condition at the time of the killing:

> "There is evidence which tends to show that the defendant was insane at the time of the acts alleged in this case. Insanity which precludes the mental process of premeditation and deliberation is a defense to the charge of murder in the first degree.

> "Generally insanity is a complete defense to these charges. In order for this to be so the disease or defect must have so impaired the defendant's mental capacity that he either did not know the nature and quality of his act or did not know that it was wrong.

> "However, if you find that the defendant had a defect in his mental reasoning you should consider whether this condition affected his ability to formulate the specific intent which is required for conviction of first degree murder. In order for you to find the defendant guilty of first degree murder you must find, beyond a reasonable doubt, that the defendant had the specific intent to kill or to premeditate or to deliberate the killing of Edwin H. Wetmore. If as a result of mental defect of reasoning the defendant did not have the required specific intent, you must find the defendant not guilty of first degree murder."

Several states have adopted a so-called theory of diminished responsibility with respect to specific intent of crimes such as first degree murder, and hold that a defendant may offer evidence of an abnormal mental condition, which, although not sufficient in degree to establish legal insanity, tends to show that he did not have the capacity to deliberate or premeditate at the time the homicide was committed—elements necessary for a conviction of murder in the first degree. Defendant's counsel in his brief admits that North Carolina has not adopted this theory. For a list of cases from other jurisdictions supporting the theory of diminished responsibility, *see State v. Baldwin,* 276 N.C. 690, 174 S.E. 2d 526 (1970). *See also* Annot., 22 A.L.R. 3d 1228.

Our Court has consistently said that the test of insanity as a defense to a criminal charge is the capacity to distinguish

between right and wrong at the time of and in respect to the matter under investigation. *State v. Cooper,* 286 N.C. 549, 213 S.E. 2d 305 (1975); *State v. Humphrey,* 283 N.C. 570, 196 S.E. 2d 516 (1973); *State v. Benton, supra; State v. Rogers,* 275 N.C. 411, 168 S.E. 2d 345 (1969), *cert. den.* 396 U.S. 1024, 24 L.Ed. 2d 518, 90 S.Ct. 599 (1970). We addressed the exact question before us very recently in *State v. Cooper, supra,* a case very similar on its facts to the present case. The question was carefully examined by Justice Lake writing for the Court. Suffice to say that nothing has transpired in the short period since we decided *Cooper* to incline us to modify our view as there set out.

[7] We have also rejected the irresistible impulse doctrine which defendant here seeks to invoke.

As stated by Justice Branch in *State v. Humphrey, supra,* at 574, 196 S.E. 2d at 519:

> "Defendant's counsel ably presented arguments for adoption of the 'irresistible impulse doctrine.' However, neither defendant's arguments nor our research disclose reasons sufficiently persuasive to warrant modification or abrogation of the long recognized 'right and wrong' test of criminal responsibility."

This assignment is overruled.

[8] Finally, defendant contends that the entry of a judgment ordering the death penalty violates the constitutional guarantee against cruel and unusual punishment and that the arbitrariness of the imposition of the death penalty deprives him of equal protection of the law guaranteed by the Constitution. Defendant admits that this Court has rejected this argument in *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974). We adhere to our decision in that case. Further discussion would serve no useful purpose. *See State v. Fowler,* 285 N.C. 90, 203 S.E. 2d 803 (1974); *State v. Dillard,* 285 N.C. 72, 203 S.E. 2d 6 (1974); *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38 (1974); *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973).

The record in this case discloses a vicious, brutal, senseless murder of a father by a son. The evidence is such that the jury could have found that defendant was not guilty by reason of insanity or, as it did, that defendant, because of hatred for his

State v. Wetmore

father, unlawfully with malice, premeditation and deliberation, killed him. It was for the jury to decide.

Because of the imposition of the death sentence, we have carefully examined the entire record in this case and have considered every contention and argument advanced by defendant. Our examination discloses that defendant received a fair trial, free from prejudicial error.

No error.

Chief Justice SHARP concurring in part and dissenting in part:

The murder for which defendant was convicted occurred on 8 February 1974, a date between 18 January 1973, the day of the decision in *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19, and 8 April 1974, the day on which the General Assembly rewrote G.S. 14-21 by the enactment of Chapter 1201 of the Session Laws of 1973. For the reasons stated in the dissenting opinion in *State v. Jarrette,* 284 N.C. 625, 666 *et seq.,* 202 S.E. 2d 721, 747 *et seq.* (1974), I dissent as to the death sentence imposed upon defendant by the court below and vote to remand for the imposition of a sentence of life imprisonment.

I concur in the decision that defendant is not entitled to a new trial upon the issue of his guilt of the crime charged, for I perceive no error which I believe affected the verdict. However, I do not concur in the statement in the majority opinion that "[w]e addressed the exact question before us very recently in *State v. Cooper, supra* [286 N.C. 549, 213 S.E. 2d 305 (1975)], a case very similar on its facts to the present case." There is a fundamental difference in the two cases:

In this case the defendant himself went upon the stand and testified (as set out in the majority opinion) "that he had planned to kill his father for about one week and decided then how he was going to do it and cover it up." By his own admission he was able to premeditate and deliberate, for he formulated and executed a plan to kill his father. He was, therefore, not entitled to a charge that the jury should consider whether he lacked the ability to formulate the specific intent to kill as a result of mental illness. The only question here was whether defendant, at the time he killed his father, was laboring under such a defect of reason in consequence of a disease of the mind

that he was incapable of knowing the nature and quality of his act, or if he did know, whether he could distinguish between right and wrong in relation to it. As to this, defendant himself testified both ways.

In *Cooper* the defendant did not testify. For proof that he killed his victims after premeditation and deliberation, the State had to rely upon circumstantial evidence. Since all the evidence tended to show that Cooper was a chronic sufferer from paranoid schizophrenia and subject to hallucinations and delusions, he contended—in my view, correctly—that the evidence of his mental disease was for the jury's consideration in determining whether the State had proved beyond a reasonable doubt the essential elements of murder in the first degree, *i.e.*, that he had actually formed a specific intent to kill his wife and children and had taken their lives after deliberating and premeditating their deaths.

The dissent in *Cooper* was not based on a doctrine of diminished or partial responsibility. Its thesis was full responsibility, but only for the crime committed. *Id.* at 594, 213 S.E. 2d at 334.

In this case, on the issue of insanity, the judge charged the jury as follows: "I charge that if you are satisfied from the evidence that the defendant, at the time of the alleged crime, and as a result of mental disease or defect, either did not know the nature and quality of his act, or did not know that it was wrong, he would be not guilty."

Obviously this charge assumes that defendant killed his father, a fact which, in the absence of a *judicial admission*, the State must prove beyond a reasonable doubt. The pitfall of such an assumption lies in wait for every trial judge who charges the jury in a case where insanity is pleaded as a complete defense unless the first issue submitted to the jury is whether the defendant killed the deceased. This is a problem to which I called attention in the dissent in *State v. Cooper, supra*, at 589-590, 213 S.E. 2d at 331. In the instant case, however, I think the error could not have prejudiced defendant.

Justice COPELAND dissents as to death sentence and votes to remand for imposition of a sentence of life imprisonment for the reasons stated in his dissenting opinion in *State v. Williams*, 286 N.C. 422, 437, 212 S.E. 2d 113, 122 (1975).

Justice EXUM dissents from that portion of the majority opinion which affirms the death sentence and votes to remand this case in order that a sentence of life imprisonment can be imposed for the reasons stated in his dissenting opinion in *State v. Williams*, 286 N.C. 422, 439, 212 S.E. 2d 113, 121 (1975), other than those relating to the effect of Section 8 of Chapter 1201 of the 1973 Session Laws.