IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-37

No. 49A20

Filed 16 April 2021

STATE OF NORTH CAROLINA

v.

FAYE LARKIN MEADER

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 269 N.C. App. 446, 838 S.E.2d 643 (2020), finding no error after appeal from judgments entered on 19 December 2018 by Judge R. Stuart Albright in Superior Court, Guilford County. Heard in the Supreme Court on 15 February 2021.

*Joshua H. Stein, Attorney General, by Matthew Baptiste Holloway, Assistant Attorney General, for the State-appellee.*

*Bonnie Keith Green for defendant-appellant.*

BERGER, Justice.

¶ 1 On December 19, 2018, a Guilford County jury found defendant Faye Larkin Meader guilty of felony breaking or entering a motor vehicle, misdemeanor larceny, and misdemeanor possession of stolen property.[1] Defendant received a split sentence, and she was placed on supervised probation. The Court of Appeals determined that the trial court did not err when it declined to instruct the jury on voluntary

---

[1] The trial court arrested judgment on the possession of stolen goods conviction.

intoxication. Defendant appeals.

## I.    Factual and Procedural Background

At approximately 2:00 p.m. on November 22, 2017, defendant arrived at a mental health counseling center in Greensboro, North Carolina. Law enforcement was contacted, and dispatch was informed that defendant was behaving as if she was intoxicated.

Earlier that afternoon, a family arrived for an appointment at the same counseling center. When the family returned to their vehicle after the appointment, they noticed that the driver's side door was open, and items were missing from their vehicle. Among the missing items were an ammunition clip, a pair of sunglasses, and a drink koozie. In addition, a soda can, which did not belong to any of the family members, had been placed in a cupholder. The husband called law enforcement to report the incident. The wife returned to the counseling center, where she observed defendant drinking soda out of a cup. The wife recognized defendant because they had attended school together.

The husband returned to the counseling center and informed an employee that someone had broken into his vehicle. He asked if anyone had "seen anything weird." Defendant, who was still in the lobby of the counseling center at the time, "stood up and came over to where [the family was] and started talking" to them. Defendant informed the husband that she knew who broke into the car and provided him with a

name. When the husband informed defendant that law enforcement had been contacted, defendant got "irate" and said, "no cops."

¶ 5 When the husband walked past defendant to exit the counseling center, he "smelled alcohol somewhere." Two other witnesses stated that defendant "appeared to be" or "seemed" intoxicated.

¶ 6 Caterina Sanchez, a therapist at the counseling center, testified that defendant "was disruptive in terms of not wanting to leave and not really listening to us [ b]ut she . . . wasn't misbehaving or anything like that." Ms. Sanchez testified that because of defendant's behavior, Ms. Sanchez decided to call law enforcement and Chris Faulkner, the owner of the counseling center.

¶ 7 Mr. Faulkner testified that, although defendant was "agitated," she "was answering the [law enforcement officers'] questions . . . [and was being] fairly cooperative." Mr. Faulkner advised defendant that she was banned from the property; when asked if she understood, defendant replied, "yes, sir."

¶ 8 When officers arrived at the counseling center, they asked defendant why she was there. Defendant told them her father passed away the previous month and that she had been the victim of a domestic violence incident the day before. Defendant removed her pants to show officers a bruise on her thigh.

¶ 9 As officers escorted defendant from the center, she became agitated and stated that she needed to collect her shoes, bra, and purse. When defendant failed to leave

the premises as instructed, defendant was handcuffed and escorted out. Defendant navigated a flight of stairs without assistance while her arms were handcuffed behind her back.

¶ 10      A search of the premises failed to reveal missing property, and officers were prepared to release defendant when they noticed a shiny object in defendant's jacket pocket. Defendant told officers that the object was a cellphone, but she pulled the missing ammunition clip from her pocket. Defendant was then arrested for felony breaking or entering a motor vehicle, misdemeanor larceny, and misdemeanor possession of stolen property. Once at the police station, the stolen drink koozie was located in defendant's jacket pocket and the stolen sunglasses were found on the floorboard of the patrol car.

¶ 11      On September 24, 2018, defendant was indicted on one count of felony breaking or entering a motor vehicle, one count of misdemeanor larceny, and one count of misdemeanor possession of stolen property. On December 7, 2018, defendant gave notice of her intent to offer the defense of voluntary intoxication. On December 17, 2018, defendant's case came on for trial. The trial court denied defendant's request for a voluntary intoxication jury instruction. On December 19, 2018, the jury found defendant guilty on all charges. Defendant entered notice of appeal.

¶ 12      In denying defendant's request for the instruction on voluntary intoxication, the trial court stated:

That will be denied[.] . . . [T]he [c]ourt has listened to all of the testimony intently. I also reviewed State's Exhibit Number 1, which was admitted without objection. And—and there are three videos on State's 1. The first video clearly shows the Defendant, and I understand that the witnesses in the light most favorable to the Defendant have testified that the Defendant was intoxicated. However, during the course of the video, I could hear the Defendant's words. She was not slurring her words. She was speaking in easily understandable English. There were many questions that were asked of her to which she was responsive. It was clear that she was responsive and was aware of what was going on around her.

For instance, they asked her how she got there, and she said, well, they brought me. It was an appropriate response to the question. She later identified, or attempted to identify the name of the people that brought her, but in any event, there are many other indications that she was responsive and aware of what was going on.

For instance, on the video you clearly hear Mr. Faulkner, the owner of the business at issue, "You are not allowed to come here any longer. You understand?" And her response was, "Yes, sir." At one point one law enforcement officer, I believe it was a law enforcement officer, asked her for her name, and she clearly indicated it was Faye Larkin Meader. It was easily understandable. It was an appropriate response, a direct response to the question asked.

Although she was escorted out of the business at issue by law enforcement officers, she was able to walk under her own power. In other words, the officers didn't have to carry her, did not have to put her in some type of wheelchair, simply directed her to leave, and that's what she did.

At one point, when she was sitting in the patrol car, she was directed or requested by the officer to put your feet

back in there for me, and the Defendant immediately complied, indicating she understood, was responsive and aware of what was going on. At one point, when she was attempting to articulate what happened, and how she got to the predicament she was in, she was complaining of another person selling marijuana and oxycontin. Oxycontin is not a—it's not a tongue-twister, but for someone that was so completely intoxicated and without the ability to form intent, it would—it would seem to me to be very hard to articulate such a word very clearly and easily, as she did, as I witnessed in the video. At one point, she indicated she wanted her coat because it was cold outside. Again, the point is she was aware of what was going on, that it was cold, and that when you're cold, you need a jacket. That's exactly what she indicated.

At one point, she was asked on the video what happened to the laptop computer, or words to that effect, and the Defendant immediately said she had no idea what the officer was talking about, which was, in fact, an accurate statement based on the facts of this case. Again, the Defendant was responsive and aware of what was going on around her, and answered that question immediately, appropriately, and, as it turns out, accurately.

She was also—the Defendant was also aware of what was going on around her because she knew she was interacting with law enforcement officers. At one point she said, "God bless you all. You all have a hard job." In any event, there is ample evidence to show that, again, she was responsive and aware of what was going on around her.

. . . .

No one in this case testified that the Defendant was, in fact, drunk. Although the testimony was that she was impaired or intoxicated on some type of substance. The substance has been unidentified.

¶ 13     In an opinion filed January 21, 2020, the Court of Appeals held that the trial

court did not err when it declined to instruct the jury on voluntary intoxication because defendant failed to produce sufficient evidence of voluntary intoxication. *State v. Meader*, 269 N.C. App. 446, 450, 838 S.E.2d 643, 646 (2020). The dissenting judge argued that substantial evidence was presented to support a voluntary intoxication instruction and the failure to instruct the jury on voluntary intoxication constituted prejudicial error which requires a new trial. *Id*. at 451–56, 838 S.E.2d at 646–50 (Brook, J., dissenting).

¶ 14 Defendant argues that substantial evidence was presented to require a voluntary intoxication instruction. We disagree.

## II. Standard of Review

¶ 15 To determine whether a defendant is entitled to a requested instruction on voluntary intoxication, this Court reviews de novo whether each element of the defense is supported by substantial evidence when taken in the light most favorable to the defendant. *State v. Mash*, 323 N.C. 339, 348, 372 S.E.2d 532, 537 (1988). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Franklin*, 327 N.C. 162, 171, 393 S.E.2d 781, 787 (1990).

## III. Analysis

¶ 16 "[T]he doctrine [of voluntary intoxication] should be applied with great caution." *State v. Murphy*, 157 N.C. 614, 617–18, 72 S.E. 1075, 1076–77 (1911). A

defendant is not entitled to an instruction on voluntary intoxication "in every case in which a defendant . . . consum[es] intoxicating beverages or controlled substances." *State v. Baldwin*, 330 N.C. 446, 462, 412 S.E.2d 31, 41 (1992).

¶ 17        To obtain a voluntary intoxication instruction, a defendant

> must produce substantial evidence which would support a conclusion by the judge that [s]he was so intoxicated that [s]he could not form [the specific] intent . . . . The evidence must show that at the time of the [crime] the defendant's mind and reason were so completely intoxicated and overthrown as to render [her] utterly incapable of forming [specific intent]. In absence of some evidence of intoxication to such degree, the court is not required to charge the jury thereon.

*Mash*, 323 N.C. at 346, 372 S.E.2d at 536 (cleaned up). "[T]here must be some evidence tending to show that the defendant's mental processes were so overcome by the excessive use of liquor or other intoxicants that he had temporarily, at least, lost the capacity to think and plan." *State v. Cureton*, 218 N.C. 491, 495, 11 S.E.2d 469, 471 (1940). "A defendant who wishes to raise an issue for the jury as to whether he was so intoxicated by the voluntary consumption of alcohol . . . has the burden of producing evidence, or relying on evidence produced by the [S]tate, of his intoxication." *Mash*, 323 N.C. at 346, 372 S.E.2d at 536. "Evidence of mere intoxication . . . is not enough to meet defendant's burden of production." *Id.* at 346, 372 S.E.2d at 536.

¶ 18   Defendant argues that witnesses testified about her bizarre behavior, that she appeared to be intoxicated, and that there was an odor of alcohol in the counseling center. In addition, defendant argues that testimony and police body camera footage established that she was out of touch with reality, hallucinating, talking to people who were not present, and unaware of her surroundings. However, while defendant's actions were periodically unusual, the mere fact that "[a] person may be excited, intoxicated and emotionally upset" does not negate "the capability to formulate the necessary" intent. *Id.* at 347, 372 S.E.2d at 537 (cleaned up). Defendant has failed to present substantial evidence that she was "utterly incapable" of forming specific intent. *Id.* at 346, 372 S.E.2d at 536.

¶ 19   The record reflects that defendant did not slur her speech or hesitate when asked to provide biographical information, and defendant gave appropriate responses to the law enforcement officers' questions when prompted. As the trial court stated, defendant "was not slurring her words. She was speaking in easily understandable English. There were many questions that were asked of her to which she was responsive." In addition, when police arrived and arrested defendant, she was able to navigate a flight of stairs with her hands cuffed behind her back. As the trial court noted, defendant "was able to walk under her own power" and "officers did[ not] have to carry her, did not have to put her in some type of wheelchair, simply directed her

to leave, and that's what she did." Thus, even in the light most favorable to defendant, defendant has demonstrated, at best, mere intoxication.

¶ 20    In *State v. Goodman*, 298 N.C. 1, 14, 257 S.E.2d 569, 579 (1979), the defendant was charged with first-degree murder, robbery with a dangerous weapon, and kidnapping. Defendant argued that his voluntary intoxication prevented him from premeditation and deliberation necessary for a conviction of first-degree murder.

¶ 21    In that case, the defendant shared a six pack of beer with two other men, consumed more beer at a bar less than thirty minutes before the victim got in the car with the defendant, and there was beer in the car the defendant was driving. *Id.* at 13–14, 257 S.E.2d at 579. However, this Court stated that "[w]hether intoxication and premeditation can coexist depends upon the degree of inebriety and its effect upon the mind and passions; no inference of the absence of deliberation and premeditation arises as a matter of law from intoxication." *Id.* at 12, 257 S.E.2d at 578 (citation omitted). This Court determined that, despite evidence that the defendant had been drinking, the defendant "was capable of premeditation and deliberation and could form the specific intent." *Id.* at 14, 257 S.E.2d at 579. This Court went on to conclude that the trial court did not err when it declined to give an instruction on voluntary intoxication because there was "no evidence which showed

that defendant's capacity to think and plan was affected by drunkenness [at the time he shot the victim]."[2] *Id.* at 14, 257 S.E.2d at 579.

¶ 22 Such is the case here. The undisputed evidence tended to show that defendant was aware of her surroundings, and in control of her faculties, both before and after the police arrived. When the husband asked if anyone had "seen anything weird," defendant stood up, walked over to the family whose vehicle had been broken into, and started talking to them. Defendant informed the husband that she knew who broke into the car and provided him with a name. When the husband informed defendant that law enforcement had been contacted, defendant became "irate" and said, "no cops."

¶ 23 Defendant understood that involving law enforcement was detrimental to her interests. To conceal her involvement in the crime, she fabricated a story about another individual's involvement. Based on these facts, viewed in the light most favorable to defendant, she cannot demonstrate that her "mind and reason were so completely intoxicated and overthrown as to render [her] utterly incapable of forming [specific intent]." *Mash*, 323 N.C. at 346, 372 S.E.2d at 536 (cleaned up).

---

[2] One could argue that *Goodman* presents an even stronger argument for an involuntary intoxication instruction than the case *sub judice* in light of the amount of alcohol that the defendant was shown to have consumed. That an instruction was not required on the facts in *Goodman* provides support for this Court's admonition that "the doctrine [of voluntary intoxication] should be applied with great caution." *Murphy*, 157 N.C. at 617–18, 72 S.E. at 1076–77.

¶ 24    Because a voluntary intoxication instruction is only appropriate when the record contains evidence that permits the jury to determine that the defendant is unable to form the specific intent necessary to support a conviction for the crime charged, the trial court did not err when it declined to instruct the jury on voluntary intoxication.

AFFIRMED.

Justice HUDSON dissenting.

Because I would hold that the evidence, when taken in the light most favorable to defendant, was sufficient to warrant a jury instruction on voluntary intoxication, I respectfully dissent.

A defendant is entitled to have the jury instructed on voluntary intoxication when there is substantial evidence that the defendant was so intoxicated that he or she could not form the requisite intent. *State v. Mash*, 323 N.C. 339, 346 (1988). "When determining whether the evidence is sufficient to entitle a defendant to jury instructions on a defense or mitigating factor, courts must consider the evidence in the light most favorable to defendant." *Id.* at 348. In addition, all reasonable inferences from that evidence must be drawn in defendant's favor. *Cf. State v. Chevallier*, 264 N.C. App. 204, 214 (2019) ("In determining whether the trial evidence adduced was sufficient to instruct on a particular theory of criminal liability, we review the evidence and any reasonable inference from that evidence in the light most favorable to the State.").

In the light most favorable to defendant, the evidence here tends to show that she was intoxicated and that she was unaware that she had taken another's property. A rational trier of fact could conclude that defendant was so intoxicated that she could not form the requisite intent to commit the offenses charged.

At trial, the jury heard testimony from various witnesses who observed defendant at the counseling center. In addition, jurors were shown footage from the

responding officers' bodycams and so were able to observe defendant's behavior for themselves. This evidence tended to show that defendant was intoxicated at the time of the alleged crime. On the day of the incident, there were two calls to 911; the first call was by a therapist at the counseling center to report an "intoxicated person," and the second call was by the vehicle owner to report a break-in to his vehicle. The first person who called 911 testified that defendant appeared to be intoxicated. Officer Fulp, who was on the team that responded to the first 911 call, testified that defendant appeared to be intoxicated or impaired by an illegal substance. And, at the scene, a witness told an officer that he smelled alcohol on defendant.

There was also evidence, much of which has not been mentioned in the majority opinion, that defendant was acting in a manner consistent with intoxication. When Officer Fulp first approached defendant, she "started talking about getting beat up the night before by a guy named Sebastian," and then defendant pulled down her pants in front of everyone. While speaking with the officers, defendant asked someone named Omar for her wallet, but no one named Omar was present at the time. When the owner of the counseling center asked the officers if they would continue their investigation outside, defendant "became loud" and had to be handcuffed. While the officers escorted defendant from the building, defendant claimed that she needed to get her bra from the bedroom, but the counseling center had no bedrooms. When she was in the police vehicle being questioned by the officers, defendant lost control of her

faculties and urinated on herself. She then refused to get out of the police vehicle. Once the officers coaxed her into exiting the vehicle, she produced a stolen ammunition magazine from her pocket saying it was her cell phone. Officer Fulp then placed defendant back in handcuffs and took her to the jail. From the jail, defendant phoned her aunt, who testified that she "sounded delirious." We are required to consider the evidence and draw all reasonable inferences in the light most favorable to defendant. Accordingly, I would conclude there was substantial evidence that defendant was intoxicated at the time of the alleged crime.

¶ 30        The majority is correct that "[e]vidence of mere intoxication . . . is not enough to meet defendant's burden of production." *Mash*, 323 N.C. at 346. "[T]he defense of voluntary intoxication depends not on the amount of alcohol consumed, but on its effect on the defendant's ability to form the specific intent [required by the statute]." *State v. Cagle*, 346 N.C. 497, 508 (1997). Evidence of exactly what substance defendant consumed, in what quantity she consumed it, and over what period of time it was consumed, is not required or dispositive. A defendant is only required to show that her intoxication rendered her unable to form the requisite intent to commit the crimes charged. *Mash*, 323 N.C. at 346.

¶ 31        Cases in which a voluntary intoxication instruction has been denied have involved either evidence of purposefulness despite intoxication or a complete absence of evidence of the effects of intoxication on the defendant's functioning. In *Cagle*, for

example, we concluded that the trial court had committed no error in refusing to give an instruction on voluntary intoxication when the defendant had consumed significant amounts of alcohol and smoked marijuana but had discussed his plan to rob the victim, took steps to follow that plan, repeatedly said, "go finish him, go kill him," and planned an alibi. 346 N.C. at 508–09; s*ee also State v. Geddie*, 345 N.C. 73, 95 (1996) ("[E]vidence showed only that defendant drank some liquor. There was no evidence indicating that defendant was so intoxicated as to be utterly incapable of forming the intent to kill."); *State v. Long*, 354 N.C. 534, 538–39 (2001) (holding that, despite being "substantially impaired," actions taken to hide his involvement in the crime demonstrated defendant could think rationally); *State v. Robbins*, 319 N.C. 465, 509 (1987) ("[N]o evidence was presented showing that the defendant's capacity to think and plan was affected or impaired by intoxication.").

¶ 32        Likewise, in *State v. Goodman*, 298 N.C. 1, 12 (1979), we held that intoxication alone does not automatically lead to the inference that a defendant cannot form the requisite intent. There, we concluded that the trial court had not erred by refusing to give an instruction on voluntary intoxication because the evidence showed that despite defendant's consumption of alcohol, he was able to drive, give directions, lead a group on a search through a neighborhood looking for items that had been stolen from his car, and participate in planning a scheme for disposing of the victim's body. *Id.* at 14. In addition, witnesses testified that defendant was "not in a drunken

condition" and we concluded that "[t]here was no evidence which showed that defendant's capacity to think and plan was affected by drunkenness." *Id.*

¶ 33        Unlike those cases, from the evidence here one could infer that defendant was so intoxicated that she could not form the requisite intent to commit the crimes alleged. A reasonable juror could infer from the evidence that defendant was unaware of her surroundings, was completely unaware that she had taken items from the vehicle, and that her capacity to think and plan was affected by intoxication. For example, when the owner of the vehicle discovered the break-in and asked if anyone had seen anything, defendant approached the owner and told an unrelated story involving a man jumping from a third floor to punch her. Also, when the police arrived at the counseling center, defendant believed they had come to help her rather than to remove her from the premises.

¶ 34        Additionally, defendant made no effort to conceal her actions. During a conversation with the officers, she told them she did not have a cell phone. But a few minutes later, when an officer asked her about a bulge in her pocket, she told the officer the bulge was her cell phone. She then proceeded to grab the bulge and hand it over to the officer without reservation or reluctance. In fact, she had handed the officer an ammunition magazine—an item reported missing from the vehicle that had been broken into. When the officers reacted to the ammunition magazine as evidence of a potential crime, defendant got upset and seemed to believe all of a sudden that

she had handed them a weapon. She said, "I didn't know [it was a gun]; I would have never handed it to you if I would have known it was a gun." She also wore the sunglasses she was later charged with stealing in her shirt in plain sight of the officers and other witnesses. Although evidence of defendant being an unskilled criminal does not entitle her to a voluntary intoxication instruction, in the light most favorable to defendant this evidence tends to show that she could not have formed the intent to commit the offenses charged. This evidence goes beyond defendant being "excited, intoxicated and emotionally upset," *Mash*, 323 N.C. at 347 (quoting *State v. Hamby*, 276 N.C. 674, 678 (1970)), and could support an inference of a real inability to comprehend the surroundings and events around her.

¶ 35        Pointing to evidence that defendant walked down a stairway while handcuffed, provided biographical information, did not slur her words, and responded to the officers' questions, the majority concludes that this is not a " 'very clear case[ ]' [where] the intoxication was so severe that it could have negated [ ] defendant's ability to form specific intent."[1] But the sum of the evidence here is, at best, equivocal. Substantial

---

[1] I also note that our law does not require that a voluntary intoxication instruction be given only in "very clear cases." The majority quotes from *State v. Absher*, 226 N.C. 656, 660 (1946), where our Court quoted from a jury instruction on voluntary intoxication. In that instruction, the trial court said, "[a]s the doctrine [of voluntary intoxication] is one that is dangerous in its application, it is allowed only in very clear cases." *Id.* at 660. Far from establishing a threshold requirement that the voluntary intoxication jury instruction only be given in very clear cases, our Court was merely quoting from a case in which the trial court determined there was sufficient evidence to warrant instructions on voluntary intoxication. The trial court then gave that instruction to the jury, warning the jury that the defense should only apply in clear cases.

evidence supports the opposite conclusion, and our courts are required to consider the evidence in the light most favorable to defendant; in doing so, I would hold that the jury should have been instructed on voluntary intoxication.

¶ 36      Finally, I would conclude that the trial court's failure to deliver the voluntary intoxication instruction to the jury was prejudicial. Having been given no instruction on voluntary intoxication, the jury was initially split regarding defendant's intent and had to be reminded that they must reach a unanimous verdict. The jury continued to deliberate before eventually requesting the definition of "utterly incapable," a term that pertains to the voluntary intoxication defense. The trial court's response was that "utterly incapable" had no legal significance in this case. Ultimately, the jury returned guilty verdicts. Because the jury seemed particularly concerned with defendant's ability to form the requisite intent, I would conclude that there is a reasonable possibility that had a voluntary intoxication instruction been given, the jury would have reached a different result.

¶ 37      When taken in the light most favorable to defendant, there is substantial evidence from which a reasonable juror could have found that defendant was so intoxicated that she could not form the specific intent to commit the offenses charged. In addition, the trial court's failure to deliver the instruction was prejudicial.

¶ 38      For the foregoing reasons, I respectfully dissent.

Justice MORGAN and Justice EARLS join in this dissenting opinion.